510

**IN RE: GLENN H.**

[No. 95, September Term, 1979.]

*Decided October 10, 1979.*

The cause was argued before GILBERT, C. J., and WILNER and COUCH, JJ.

*Glen M. Fallin* for appellant.

*Valerie A. Leonhart, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, Sandra A. O'Connor, State's Attorney for Baltimore County,* and *Howard B. Merker, Assistant State's Attorney for Baltimore County,* on the brief, for appellee.

GILBERT, C. J., delivered the opinion of the Court.

The appellant, Glenn H., a juvenile, committed an act that had he reached age 15 or older would have resulted in a charge of murder. Glenn was adjudged by the Circuit Court for Baltimore County, sitting as a juvenile court (Raine, J.) to be a delinquent. He was committed to the jurisdiction of the Juvenile Services Administration. Glenn was placed in

Edgemeade of Idaho, a non-public facility providing individual and group therapy. That placement was apparently deemed necessary because of Glenn's being emotionally disturbed. Approximately one year later, in March 1978, Glenn, for some reason not revealed by the record, was moved to Edgemeade of Maryland. The cost, per annum, of maintaining Glenn at the Edgemeade facility was approximately $20,681.[1] Seemingly, without consulting either the Department of Juvenile Services or Judge Raine,[2] the Baltimore County Department of Education or the State Department of Education[3] referred Glenn to the Hannah More Center, Reisterstown, Maryland, on September 1, 1978.[4] The Center was not informed, at the time Glenn was referred to them, of the nature of offense for which he had been found delinquent.

We infer from the record that certain publicity was generated relative to Glenn's being able to leave the Hannah More Center on week-ends and to spend them with his family. As a result of that publicity the juvenile court judge wrote to the Center stating:

> "It has been brought to my attention as the Juvenile Judge of Baltimore County that the above entitled individual is now located at your Center. The file clearly indicates that the matter was disposed of by Judge John E. Raine, Jr., when he was the Juvenile Judge.

---

1. This information is obtained from a postscript to a letter written by Glenn's father to the judge exercising juvenile jurisdiction in Baltimore County.

2. The "Commitment Order," signed by Judge Raine in March 1977, specifically provides that the child is to be "kept in the care and custody of the" State of Maryland Dept. of Juvenile Services, "subject to the further order of . . . Court."

3. From the record, we cannot ascertain which of the two actually referred Glenn to Hannah More.

4. The postscript to the letter of the father to the judge of juvenile court states that the annual cost of maintaining Glenn at Hannah More was $12,938. It is obvious from the letter that the father opted for Hannah More. He penned to the postscript, "It is beyond my comprehension why the State of Maryland would elect to spend $7,743 for an institution exhibiting a program far inferior to the one offered at Hannah More." The Hannah More Center is privately funded.

I learned that this young man spends his week ends at home without any supervision from your department. Perhaps this may be in order, but on the other hand, the nature of the offense would indicate to me no week ends, or strictly supervised week ends.

However, I will keep an open mind and would be most happy to discuss this matter with you personally at anytime. It is my responsibility as the Juvenile Judge to look into these matters, and, frankly, I am concerned if the above is true. Please advise at your earliest convenience."

The judge's letter did several things: 1) It prompted the Center to "reevaluate the appropriateness of Glenn's placement in ... [the Center's] program"; 2) Glenn was restricted to the campus and was not allowed to "be involved in home or community activities" pending "final determination in his case"; 3) In the words of the judge "stirred up a hornet's nest." Glenn, however, was the only one who was eventually stung.

A court psychiatrist, pursuant to an order of the court, wrote to the judge on December 20, 1978, that:

"1. Glen [*sic*] must currently be considered dangerous; it is somewhat problematic whether he is less dangerous than in the past or not. He has continued to have occasional violent outbursts of apparent total loss of control. These seem less frequent than before, and may be less severe and less directed towards persons than previously, but that is not clear. The psychological testing reveals many tendencies suggesting a proneness to violent eruptive behavior.

2. Glen [*sic*] appears to be making very significant progress. There appears to be increased self-control, more social appropriateness with enhanced skills and social values which were previously lacking, and somewhat more ability to deal with others and with his own feelings in a verbal fashion. It is clear that

significant problems remain. To some degree he would seem to have increased emotional strength. To some extent, he may be channeling some of his more violent aggressive feelings into somewhat antisocial behavior rather than into explosions. He seems to continue to use a great deal of avoidance of difficult problems and feelings, partially controlling himself through suppression of feelings. This results in his exploding less frequently, generally behaving more appropriately, but still having a rather unpredictable hair trigger effect. It also paradoxically makes therapy for him much more difficult, the therapy which he would need in order to show improvement in these areas.

. . .

4. Glen [*sic*] would appear to need placement in a residential treatment center. The center should have: (1) Flexibility, with the capacity to provide a secure setting, but also to relax the security as behavior and adjustment warrants it. (2) Concurrently they should have the capacity to deal with disruptive and antisocial behavior if it occurs. (3) An on-grounds school; (4) Individual psychotherapy, within a comprehensive treatment program (i.e., integrated and organized along therapeutic lines.

. . .

5. The question of visitation certainly arises. There clearly is a dilemma between (a) the apparent risk to the community on the one hand — Glen's [*sic*] violence appears to be unpredictable; however, he apparently has been having some degree of supervised and unsupervised visitation for the past two years without untoward incident, even though not handling himself too well at Hannah More; versus (b) benefits — visitation frequently provides a motivational incentive in the treatment program, helps normalize life somewhat, and helps to maintain very important family ties.

> While it clearly falls to the Court to decide what degree of calculated risk can be accepted, I would lean towards allowing visits, assuming that they are quite well-supervised, an integrated and well-assessed aspect of the treatment program, with the Court's being closely informed as to the ongoing situation."

A hearing was set before the juvenile court [5] on November 30, 1978, for the purpose of having a "Review of Commitment for Placement." Glenn and his father appeared at the hearing. The juvenile was not represented by an attorney, nor does it appear that he was informed either directly or indirectly through his father of the right to be so represented. Moreover, there is nothing contained in the record from which we can infer a waiver. The appellant's constitutional,[6] statutory,[7] and procedural [8] right to counsel appears to have been ignored. The hearing was almost monopolized by the judge, the Deputy State's Attorney, and the Director of the Hannah More Center. Glenn did not speak so much as one word. His father uttered 13 lines out of 15 pages. The substance of the 13 lines was that the "Juvenile Authorities" were advised of Glenn's transfer to Hannah More.

A second hearing was held on December 21, 1978. The cast of characters changed somewhat, but Glenn was still not advised of his right to counsel. This time Glenn's father said only three words in an 18 page transcript, and those words were merely to acknowledge that he understood his son did not want to attend Edgemeade of Maryland.

The judge concluded that the "logical thing would be ... for the convenience of everybody including Glenn and his family," for the juvenile to be committed to the Maryland Training School. He then so ordered.

Reminiscent of John Ford "Westerners," counsel, belatedly retained at the last split second, galloped on to the scene. Armed with eight issues, one of which is sub-divided into five

---

5. Whether the State requested the hearing or the court, *sua sponte*, ordered it is not clear.
6. *See* In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).
7. Maryland Courts and Judicial Proceedings Code Ann. § 3-821.
8. Md. Rule 906.

parts, counsel asks that we reverse the juvenile court for a host of reasons. We shall reverse, but we deem it unnecessary to reach anything more than the appellant's first issue which asserts:

"I. The lower court violated Appellant's right to counsel by conducting a hearing *sua sponte,* [9] to review his commitment as a delinquent child and, at the conclusion thereof, order a substantially more restrictive commitment of Appellant, when Appellant was not represented by counsel and there had been no express waiver of counsel."

Our review of the record fails to disclose that either the appellant or his father were apprised of the appellant's right to counsel at the hearings of November 30 and December 21, 1978. Neither appellant nor his father was advised of appellant's right to confrontation of witnesses on cross-examination. The change in commitment was based in large part upon a psychiatric report, but no opportunity was apparently afforded appellant to ask the author of that report any questions.

In Md. Courts and Judicial Proceedings Code Ann. § 3-821 is embodied the legislative fiat that "a party is entitled to the assistance of counsel at every stage of *any* proceeding under this [Juvenile Causes] subtitle." (Emphasis supplied.) Md. Rule 906 provides:

"a. *In All Proceedings — Appearance of Out-of-State Attorney.*

The respondent is entitled to be represented in all proceedings under this Chapter by counsel retained by him, his parent, or appointed pursuant to the provisions of subsection b 2 and 3 of this Rule. . . .

b. *Waiver of Representation — Indigent Cases — Non-Indigent Cases.*

1. Waiver Procedure.

If, after the filing of a juvenile petition, a

---

9. *But see* n. 5, *supra.*

respondent or his parent indicates a desire or inclination to waive representation for himself, before permitting the waiver the court shall determine, after appropriate questioning in open court and on the record, that the party fully comprehends:

(i) the nature of the allegations and the proceedings, and the range of allowable dispositions;

(ii) that counsel may be of assistance in determining and presenting any defenses to the allegations of the juvenile petition, or other mitigating circumstances;

(iii) that the right to counsel includes the right to the prompt assignment of an attorney, without charge to the party if he is financially unable to obtain private counsel;

(iv) that even if the party intends not to contest the charge or proceeding, counsel may be of substantial assistance in developing and presenting material which could affect the disposition; and

(v) that among the party's rights at any hearing are the right to call witnesses in his behalf, the right to confront and cross-examine witnesses, the right to obtain witnesses by compulsory process, and the right to require proof of any charges.

2. Representation of Indigents.

(a) Unless knowingly and intelligently waived, and unless counsel is otherwise provided, an indigent party, or an indigent child whose parents are either indigent or unwilling to employ counsel, shall be entitled to be represented by the Office of the Public Defender at any stage in a waiver, adjudicatory or disposition hearing, or hearing under Rule 916 (Modification or Vacation of Order).

. . .

3. Non-Indigent Cases.

Upon motion of any party or upon the court's

motion, the court may appoint an attorney to represent a child. Compensation for the services of the attorney may be assessed against any party."

The proceedings [10] in the instant case fall well short of anything resembling compliance with Md. Rule 906. *Ergo,* reversal is required. Inasmuch as the presence of counsel might well prevent some, if not all the other issues from being raised at any hearing, to discuss them would serve no purpose other than to prolong this opinion.

> *Order reversed.*
> *Case remanded for further proceedings.*
> *Costs to be paid by Baltimore County.*

---

**10.** In oral argument the State took the position that hearings before the juvenile court judge were not "proceedings," and, therefore, there was no requirement that the juvenile be offered counsel. We have an entirely different view. Md. Rule 5 W defines " 'a proceeding' or 'the proceedings' " to mean "all or any part of an action." We believe the occurrences in this case that took place before the juvenile court fall within the ambit of that definition and, hence, are "proceedings." That being so, the juvenile should have been advised of his right to a private attorney of his own choosing, or if he or his parents could not afford one, the Public Defender would represent him. Of course, the juvenile also had the right to waive counsel provided the waiver satisfied Md. Rule 906 b 1.