947 A.2d 90

**In re JULIANNA B.**

**No. 1125 Sept. Term, 2007.**

Court of Special Appeals of Maryland.

May 2, 2008.

514

Nancy S. Forster, Public Defender, Baltimore, for appellant.

Mary Ann Ince (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, for appellee.

Panel: HOLLANDER, JAMES R. EYLER, and SHARER,* JJ.

* Sharer, J. Frederick, participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a retired, specially assigned member of this Court.

HOLLANDER, Judge.

The Circuit Court for Montgomery County, sitting as a juvenile court, found Julianna B., appellant, delinquent, based on its determination that she committed second-degree murder and related offenses. At an initial disposition hearing on January 11, 2006, the court committed appellant to the Department of Juvenile Services ("DJS" or the "Department"). This Court affirmed. *See In re Julianna B.*, 177 Md.App. 547, 936 A.2d 906 (2007) (*"Julianna I"*).

The circuit court held a review hearing on June 18, 2007, at which it declined to modify the terms of appellant's commitment.[1] Instead, it continued appellant's detention at a secure DJS facility. Appellant challenges that ruling, posing the following questions:

I. In issuing an Order prohibiting the Department of Juvenile Services from implementing the program of rehabilitation that the Department had designed for Ms. B. which included passes for outings, home visits, and to pursue her college education, did the juvenile court violate the Separation of Powers Doctrine and the Juvenile Causes Act?

II. Notwithstanding uncontested evidence, including rarely given testimony by the Secretary of the Department of Juvenile Services, that Julianna B. had earned and was deserving of home passes and supervised college attendance as an important part of her program of rehabilitation, did the juvenile court abuse its discretion, violate the Juvenile Causes Act and violate Ms. B.'s due process rights in ordering that Julianna B. must not receive home passes or be permitted to

---

1. In effect, the "State" took both sides in the proceedings below. DJS, represented by an Assistant Attorney General, joined appellant in her request for modification of her commitment. The prosecutorial arm of the State opposed modification, however, and was represented by an Assistant State's Attorney. Only one representative of the "State's" interest has appeared before us on appeal, through an Assistant Attorney General. We shall use the term "State" to refer to the State's prosecutorial arm.

attend college solely as a punitive measure because, in the judge's words, "21 months [of detention] is woefully inadequate"?

The State has moved to dismiss this appeal. It argues that "the juvenile court's discretionary ruling declining to alter the disposition in Julianna B.'s case does not constitute a final, appealable order."

For the reasons that follow, we shall deny the motion to dismiss, vacate the juvenile court's order, and remand for further proceedings.

## I. FACTUAL & PROCEDURAL SUMMARY[2]

On September 23, 2005, during a fight in the parking lot of a high school, appellant, then fifteen years old, fatally stabbed fifteen-year-old Kanisha Neal (known as "Missy"). On December 22, 2005, the juvenile court determined that appellant's conduct constituted second-degree murder and related offenses. In *Julianna I*, 177 Md.App. at 549–54, 936 A.2d 906, we quoted, in part, the factual summary provided by the circuit court:

"On the night of September 23, 2005, [the victim] and her friends, and [appellant] and hers attended a football game between Sherwood and Blake [High Schools]. . . .

\* \* \*

[The victim] walked towards [appellant] intending to fight.

\* \* \*

With respect to [the victim], I find that she was 5 feet, 5, and she weighed 225 pounds; that she was 15 years old; that she possessed no weapon at any time; that she only used her fists; that she threw the first punch; that she approached [appellant] as [appellant] stood still; that she pulled six hair extensions from [appellant]'s head; that she

---

**2.** The initial disposition was not at issue in *Julianna I*. We have included in our summary facts pertaining to the initial disposition proceedings, because they provide a context for our review of the ruling denying modification.

was unaware that [appellant] had a knife.... She was twice [appellant]'s weight and probably a lot slower than [appellant].

With respect to [appellant], I find that [appellant] was about 115 pounds; that she never ran for help to the police or adults.... She didn't run away.

\* \* \*

This Court also finds that she armed herself in advance with a knife, a deadly weapon. When [the victim] approached, she stood still with clenched fist and a secreted knife. As I indicated, she didn't retreat.

\* \* \*

Her current lie, that [one of her friends] placed an object in her back pocket, that [appellant] knew it was a knife without asking for one, seeing it, touching it, [the friend] saying anything is preposterous.

[Appellant] and [the victim] squared off, and [the victim] punched first, and [appellant] followed suit. [The victim] got the better of her, and [appellant] pulled out her deadly dagger; [appellant] never falling; never being choked. Her lucid responses for hours and hours afterwards and her pristine face depicted in [a photo taken shortly after the fight] gave testament to the State's theory of a one-on-one fight.

Once [appellant] pulled the knife, she slashed at [the victim] and made contact with her on six occasions, three cuts to [the victim]'s abdomen, one on each arm, which were consistent with defensive wounds, and a stab wound to the heart.

.... [Appellant] said she didn't know she stabbed [the victim]. As soon as [the victim] fell, [appellant] stopped fighting, and she immediately concealed the knife. These actions belie her statement.

Furthermore, the narrow wound to [the victim]'s left ventricle, which entered 3–1/2 inches, were [sic] straight in and straight out, which would indicate consciousness of penetration.

* * *

Flight is evidence of consciousness of guilt, and she fled the scene and discarded the knife somewhere. [Appellant] never went over to the victim to render aid or say that she was only trying to get her off. She never went over and said, 'Oh, my gosh! I can't believe this happened. Are you okay? I didn't mean to go this far. I didn't want you to die. I didn't want you to fall.' Never said that. Never approached that. Rather, she remorselessly said ... 'I stabbed that fat bitch.'

* * *

No, [appellant], you were not in immediate danger of death or serious bodily injury. You never kicked [the victim] in the shins, screamed for help, or ever tried to cut her in her lower legs if your head was down, as you say. You escalated the fight by plunging that serrated blade into [the victim]'s heart with the intention to inflict serious bodily injury. I do not find that you acted in perfect self-defense or imperfect self-defense.

I, therefore, find, beyond a reasonable doubt, that you were involved in the second degree murder of [the victim] with the intent to inflict serious bodily harm, with a depraved heart, and by way of felony murder."

On January 9, 2006, DJS filed a Pre–Disposition Investigation Recommendation ("PDI"), noting that appellant had no prior record. In a section captioned "Perception of Offense(s)," DJS observed that "Julianna presents as very remorseful regarding her involvement in the current offense. She is prepared to take responsibility for her actions." The final section of the PDI was captioned "Recommended Treatment Service Plan." It called, *inter alia,* for "[p]lacement at the Waxter Children's Center."

A psychological evaluation of appellant, conducted by James J. Smith, Ph.D., a psychologist, was appended to the PDI. Dr. Smith noted that appellant "admitted to stabbing the victim during a physical altercation." Further, he said: "During her [pre-trial] detention at the Noyes Center, Julianna has been

described [as] respectful, relates well to others, and her behavior has been characterized as above average. She has attained the highest behavioral level in the detention center." Dr. Smith offered the following recommendation:

Given the serious nature of the current offense, it is recommended that Julianna be considered for placement outside of her home and community and into a DJS facility. Although such a placement needs to be an appropriate consequence for her actions, there does not appear to be a need for intensive therapeutic services, and such a placement is not likely to be long term. However, placement in a locked facility, such as the Waxter Center, could be considered, but the length of her stay could be tied to her overall compliance and performance within the program. The prognosis for successful completion of such a program is considered to be very good.

The court held a disposition hearing on January 11, 2006.[3] A representative of DJS, identified in the transcript as "Ms. Armstrong," joined in the recommendation expressed in the PDI. She requested placement of Julianna in "the long-term secure program" at Waxter Children's Center. Armstrong added: "It's the long-term behavior modification peer program," and cautioned: "We don't know how long she'll be at Waxter. It'll depend on her behavior and then the Court's decision based on how long the Court wants her to stay there."

Appellant's counsel pointed to the reports from the staff at Noyes, indicating appellant's exceptional behavior, and suggested that "home detention would permit [appellant] to be in a situation where she could have all the restrictions, but at the same time, get the education." Her attorney also asked the court "to maintain [appellant's] level of schooling."

---

**3.** We note that the Recommendation and the transcript of the disposition hearing held on January 11, 2006, are not contained in the materials transmitted to us, but are contained in the portions of the record considered in *Julianna I.*

The Assistant State's Attorney ("ASA") "adamantly oppose[d]" the request for home detention, arguing:

Your Honor, this is a case in which the Court found [appellant] involved in committing a second degree murder....

\* \* \*

And, Your Honor, the State believes that based on the serious nature of the offense, Ms. B's role in it, and in holding her accountable for what she's done, the State is going to ask that [appellant] be held, ordered to be held at the Waxter facility until she is 21.

After hearing a brief statement from Joyce Neal, the victim's mother, the court acknowledged "the grief and loss that the Neal family has endured," noting: "I have no sentence within my disposal that could even the score of this incident." It ruled:

Now, having found Julianna involved of second degree murder, this case is back before me for final disposition. And that's somewhat of a misnomer, because this Court will maintain jurisdiction over this case until she reaches the age of 21 or the case is dismissed before that; that is, the jurisdiction terminated. I will continue to personally monitor this case until she reaches 21 or until it's closed out.

\* \* \*

Our state legislature has established [a] separate lexicon for juveniles, which serves notice to the public that they are to be treated differently than adults. For example, juveniles are not found guilty, but involved; not convicted, but determined to be delinquent; not placed in jail or a penitentiary, but in a detention facility.

The maximum incarceration that an adult could receive for a second degree murder is 30 years. That would mean, were Julianna convicted as an adult, she could serve or the Court would have within its power to keep her incarcerated until she turned 46, still a relatively young age when you consider life expectancies. But yet, that would be 30 years down the road.

The maximum detention that a juvenile can receive for a case that's in juvenile court, where this case is, is until they reach their 21st birthday. That is a 25-year difference.

The legislature has it enacted in the code the criteria for this Court to consider when sentencing a juvenile, which I must follow. The Court must balance objectives for children who have committed delinquent acts. I must balance the public safety and the protection of the community, accountability of the child to the victim and the community for the offense committed, and the competency and character development to assist ... the child ... in becoming a responsible and productive member of society when she does leave this Court's jurisdiction.

When we look at Prong No. 3, competency and character, I find that Julianna has been leading, to this point, somewhat of a double life. We've had counselors. We've had a lot of reports indicating that she is an exceptional student and a lovely young lady the majority of the time that she is seen in public, and I don't doubt any of those.

However, the other side was brought to the attention of this Court in the incident itself on September 23rd.

\* \* \*

This is a tough case, because no amount of detention can even the ledger, can set the score straight, can balance it. And that's not what my job is. That's not what my authority allows.

\* \* \*

[Appellant] asked that I consider home detention. And although I do agree that she would do extremely well—in fact, I think I could send her home and put her on probation, and I suspect she probably would do very well. And were we dealing with a shoplifting or a housebreaking or something along those lines, State might even consent; Department may even ask for that.

The State, on the other hand, is asking me to sentence her to her 21st birthday. It's premature for that, because I

must consider the development, the character-building prong of my sentencing criteria along the way.

I do agree with the report of the psychologist, the Department of Juvenile Services, and the State, that she needs to be in detention ... out of the community.

Public safety and protection of the community and accountability of the child require that. And to my understanding, Waxter is the only maximum security facility within this state [sic] ... that has a long-term program.... I find that it is appropriate in this case.

\* \* \*

[T]herefore, I will find Julianna delinquent. I will place her at the Alfred D. Noyes Children's Center pending transfer to the Waxter Children's Center for the long-term placement. We'll see what happens in the next round, the next chapter. I will not set a review date. I'll wait to hear from the Department.[4]

The juvenile court subsequently issued a Disposition and Commitment Order, in which it found that appellant was delinquent and that "the best interests of both [appellant] and the public would be served by continuing to remove [appellant] from her home environment as it is contrary to the safety and welfare of [appellant] and the community because she is a serious risk to herself and others." It committed appellant to the custody of DJS, "with the right of the custodian to consent to such medical, educational, and ordinary treatment as may be determined to be in [appellant's] best interest, subject to the further order of this Court." Further, it ordered that appellant "be detained at the **Alfred D. Noyes Children's Center** pending transfer [to] **The Waxter Children's Center** for long-term placement...." The court also ordered appellant "placed and continued under the jurisdiction and supervision of this Court...."

---

4. The judge added: "Although my assignment is being changed for better or for worse, I'm going to maintain personal jurisdiction ... over this case." As a result, all subsequent orders in the case have been issued by the same judge.

On January 17, 2006, DJS filed a "Certification of Implementation." It stated that "the Treatment Service Plan for [appellant], which was recommended by the Department of Juvenile Services at a disposition hearing and approved by the Court ... [w]as implemented as of 01–17–06." [5]

Appellant noted her first appeal to this Court, in which she claimed that the court should have found her involved for manslaughter, not second-degree murder. Appellant did not challenge the juvenile court's initial Disposition and Commitment Order, however. We affirmed the juvenile court's adjudication of delinquency. *Julianna I*, 177 Md.App. at 561, 936 A.2d 906. [6]

On April 7, 2006, three months after appellant's initial disposition hearing, appellant's DJS case manager submitted a Memorandum to the court regarding appellant's "[e]ligibility for outings and home passes." The case manager noted that she had "informed the staff at Waxter that Julianna must have all passes and outings Court approved." In support of the request for such permission, the Memorandum stated:

Julianna has done extremely well at Waxter to date. She earns 100% of her points every day in the program. All members of the treatment team at Waxter have very positive things to report about Julianna and her progress. She

---

**5.** In her reply brief, appellant argues that "[t]here is no indication in the record that the court ever formally adopted a treatment service plan for Ms. B." The record of the disposition hearing indicates, however, that the court adopted the Department's initial treatment service plan, which provided for detention at the Waxter Center.

**6.** Appellant argued in *Julianna I* that the court should have found imperfect self-defense (which would have mitigated the murder to manslaughter), because "she was (1) entitled to use *some degree of* force to defend herself against an assault, and (2) used deadly force under an honestly held—but objectively unreasonable—belief that such action was necessary to prevent the victim from continuing the assault." *Julianna I*, 177 Md.App. at 556, 936 A.2d 906 (emphasis in original). We upheld the finding of involvement on the basis of the juvenile court's "express finding that appellant deliberately inflicted the fatal stab wound at a point in time when she did not have a subjective belief that she was in danger of death or serious injury." *Id.* at 561, 936 A.2d 906.

is earning good grades and she is respectful to the staff and her peers. Julianna is considered a role model in the program. Given this positive behavior, Julianna has earned the "Purple Level". On the Purple Level, students are eligible for outings with staff members (movies, bowling, outside activities, etc.) As well as passes with family. The passes increase in length as she progresses in the program. At first, students complete two 2–hour passes, then two 12–hour passes, then two 24–hour passes, and finally, two 48–hour passes.

However, DJS advised the court that the State's Attorney was "adamantly opposed to Julianna going on outings/passes." According to the case manager, a representative of the State's Attorney's office stated that "Julianna has only been at Waxter a short time and it is too soon to allow such passes.... [I]f the Court is inclined to grant the outings/passes, the State would like a Review Hearing in the matter so that the victim's family may be present/heard." The case manager stated that DJS "defers to the Court in this matter."

The court denied the request for home passes and outings without a hearing; on the bottom of the DJS Memorandum, the judge wrote: "Respondent has been adjudicated delinquent of 2nd MURDER! Denied !!" (Capitalization and underlining in original). The judge also sent an Action Memo to the court's Juvenile Division Assignment Commissioner. He marked with an "X" the box on the form next to the line, "No action to be taken at this time." In addition, he wrote "DENIED!!" at the top.

The following month, on May 17, 2006, appellant's new DJS case manager, Niasha John, filed another Memorandum with the court, requesting a home pass for appellant. Ms. John reported:

Julianna continues to excel in the program and ... she is doing exceptionally well both behaviorally and academically.... Julianna is currently on the highest level which is the gold level at Waxter's. The entire treatment team has stated that it is a pleasure to work with Julianna and that

she is a leader and a great help to the staff and the other girls in the program.

At this time, Waxter's is requesting a home pass, based on her accelerating progress in the program. The Department has enclosed a treatment progress report and letter from Waxter's in regards to Julianna. Waxter's feels that as a part of her rehabilitation process it is essential for Julianna to participate in outings and the privileges that is [sic] available to her. The outings include but are not limited to recreational activities. Other activities include those of an educational nature such as college tours, museums, etc. The treatment team feels that although the initial request for a home pass was denied, Julianna has maintained consistency and has in fact continued to excel in the program.

A "Treatment Progress Report," prepared by Dr. Keith Hannan, appellant's psychologist at the Waxter Center, was attached to the Memorandum. Dr. Hannan stated:

Juliana [sic] was involved in an incident at a high school football game in September of 2005, in which she was attacked by a group of girls, and responded by pulling out a knife she had been given by a friend and stabbing one of her attackers. The girl later died.

\* \* \*

*[P]rior to the killing in September, Juliana had no history of delinquent behavior. She was an honor student, with no involvement in antisocial activities.* She enjoyed the role of peacemaker when others would squabble. She took pride in being a positive influence on her friends. She reported a close relationship with her mother and sister. Indeed, her mother visits twice weekly, never missing a visitation time. *Juliana has not abused drugs. In essence, she displayed none of the risk factors for delinquency.*

\* \* \*

Talking about the killing has been very difficult for Juliana. She has been very tearful. She clearly feels very badly about what happened.... *She continues to suffer from guilt.* At this point, she is still struggling to figure out

how she is going to live with her involvement in the killing. *Clearly, her behavior during the incident does not fit with her values.* She is able to acknowledge that she feared for her life during the incident and that she might have been killed had she not used the knife. However, she reports that the guilt is so difficult to bear that she wishes she had never had the knife even though it might mean that she would have been killed.

*Juliana's behavior on the unit has been exemplary. She is a positive leader,* encouraging the other girls to refrain from antisocial behaviors. She is seen by all of her peers as a source of support. She regularly diffuses tension that erupts between other girls. In groups, she is a real asset, helping to get her peers focused on group topics in a productive way.

*I have seen enough of Juliana to believe that she represents no risk to the community.* She has no history of aggressive or antisocial behaviors, other than the killing. Her behavior during the incident can be seen as an unfortunate response to a terrifying situation. *I have found no evidence of character defects that would indicate a risk of future involvement in aggressive acting out.*

*The long-term secure program is a six to twelve month program. A key part of the program involves a slow transition to the community. Girls earn home passes through good behavior.* The family must also be seen and assessed for the home passes to take place. While on a pass, girls are supervised at all times by their parents. Home passes allow girls supervised time with their family during which they can practice new skills they are learning in the program. If difficulties emerge, they are addressed in their treatment upon their return to the facility.

*I believe home passes would assist Juliana in the healing process, while at the same time, not compromising the safety of the community.* (Italics added).

Six days later, the court denied the request, again without a hearing. Then, on July 3, 2006, appellant's DJS case manager

sent a Memorandum to the court, requesting a "Six–Month Review Hearing" for appellant. On July 31, 2006, the judge signed an "Action Memo," in which he again checked the box for "[n]o action to be taken at this time." He also crossed out the section for scheduling a review hearing and inserted the words "do not" into a portion of the form, which then read: "Please do not schedule the above captioned petition(s) for . . . Review Hearing."

On December 21, 2006, six members of appellant's treatment team at the Waxter Center, including Dr. Hannan, signed a letter to the judge "to update [him] on the progress of [appellant] in the Long–Term Secure Program at the Waxter Center." The letter reiterated many of the observations of Dr. Hannan's prior Treatment Progress Report, and included the following additional statements:

We believe that [appellant] has started to accept what happened and will find a way to integrate the events of that day into her life.

\* \* \*

Juliana [sic] has poured her energy into her education. She earned the credits necessary to graduate from high school. She competed in the Department of Juvenile Services oratorical contest and won first place. She is currently studying to take the SAT.

\* \* \*

Juliana's crime was extremely serious. While we function as a rehabilitative program, we also take seriously our role in protecting the community from dangerous juvenile offenders. We have subjected Juliana to careful scrutiny. *We have seen enough of her to believe that she represents no risk to the community.*

\* \* \*

We are respectfully requesting permission for [appellant] to have a series of home passes, which, if successful, will lead to her release from the program. . . . *We believe Juliana has already received maximum benefit from our program* and is ready to move on with her life. *We are very*

*confident that this youngster does not represent a threat to the community.* Instead, we believe she will become a productive adult who is an asset to her community.

(Emphasis added). The court took no action in response to the letter.

On March 28, 2007, appellant's case manager, Ms. John, sent another Memorandum to the court, including a "Case Update and Request for a Review Hearing." DJS attached to the Memorandum a fourteen-page psychological evaluation conducted on February 19, 2007, by Laura Estupinan–Kane, Ph.D., a psychologist,[7] as well as the December 2006 letter from appellant's treatment team. Ms. John stated:

Julianna has continued to do well at the Waxter Center. Julianna has earned all her high school credits and was able to graduate in October 2006. Her commencement ceremony was held at the Waxter's [sic] Center in which Waxter's staff members, family, friends, and the education department were in attendance. [Former DJS] Secretary Kenneth Montague was in attendance as well and spoke very highly of Julianna and her achievements.... Julianna took the [SAT] in January 2007 and received a score of 1550 out of 2400.... Julianna has excelled scholastically, and has very high potential to be an academic scholar. The ultimate goal is for Julianna to be able to transition back into the community and attend college. Julianna is currently taking an online course at Anne Arundel Community College for Introduction to Psychology.

Julianna continues to be a positive role model and has been an enormous help to staff members and teachers. At Julianna's treatment team meetings staff members have nothing but positive things to say about Julianna. She has been on Gold Level (which is the highest level in the program) since April 2006. Julianna has qualified several times for the purple room which has special privileges and is used to recognize excellent behavior in youth.

---

**7.** The report is discussed in detail, *infra.*

Julianna has a very large family support system and they are present at all treatment team meetings and other family-oriented activities in the program. She has also made great strides in therapy sessions.... The aftercare treatment team is recommending that community visits be integrated as an aftercare plan.

\* \* \*

At this time, the Department is requesting a Review Hearing to further discuss options to assist her rehabilitation process.

A week later, on April 5, 2007, counsel for appellant also filed a Request for a Review Hearing. The court granted the request, and the review hearing was held on June 18, 2007.

At the hearing, Donald DeVore, the Secretary of DJS, testified in support of DJS's recommendation. The court commented: "I think it's the first time I've had a Secretary actually come to court and testify. And obviously, it shows the level of interest that the Department has [in Julianna]."

Secretary DeVore testified that he was "very impressed by the way that [appellant has] conducted herself in our facilities...." He emphasized appellant's academic achievements and her role as "an arbiter for disputes and conflict that's existed within the facilities." Noting that appellant had "completed the first phase of her treatment" under DJS, "which was a period of confinement and treatment at Waxter Center," the Secretary explained: "And we're now at a point, Your Honor, where I think we need to give consideration for that appropriate type of transitioning plan," because appellant "represents no further risk to our community...." Secretary DeVore underscored the importance of an "appropriate transition plan," stating:

What I've learned, Your Honor, about our facilities ... is that what happens within our facilities is important, but [what] is almost more important is that there be an appropriate transition plan for kids when they're ready to leave our facilities.

When you look at recidivism rates in our general population, the majority of kids that recidivate are ... kids who come back into our system because we haven't done a good job of providing for transitioning.

The Secretary presented the transition plan recommended for appellant by DJS.[8] The plan called for appellant to "gradually transition back to the community by successfully attending Anne Arundel Community College, home visits, participating in family therapy and continuing to participate in individual therapy," with the ultimate goal, by the end of 2007, of release from Waxter to the custody of her mother on aftercare supervision. Secretary DeVore explained that the home visit passes would progress from once-a-week day passes, to overnight, and then to weekend passes, predicated on direct parental supervision at all times. The transition plan also provided a suggested course schedule for appellant at Anne Arundel Community College, and anticipated that "Waxter will provide transportation to and from ... the [campus] daily." [9] Further, Secretary DeVore indicated that DJS staff could accompany appellant to classes, "if the Court saw that as necessary and appropriate." Additionally, the Secretary noted that, after appellant's anticipated release from the Waxter Center in January 2008, "[s]he would continue under our supervision of probation ... and any conditions that the Court would consider appropriate to impose upon her at that time."

The court questioned DeVore about the educational options for appellant if she remained at Waxter, including "undergraduate studies." DeVore responded: "So far, Your Honor, she's taken one [college] course, which was three credits in psychology. And that was an on-line course at Waxter, using the computers there.... But with on-line, it would probably be one course at a time...." Later, DeVore explained that

---

**8.** DJS had submitted the proposal to the Court, in writing, prior to the hearing.

**9.** The plan contemplated that Julianna would be permitted to be on campus from 9 AM to 2:30 PM, Monday through Friday. *Id.* at 34.

appellant had limited access at Waxter to internet-accessible computers needed for on-line college courses. Moreover, not all courses required for a degree program are available on line.

The following exchange is noteworthy:

[The Court]: And I'm sure you're acutely aware that the legislature, in their wisdom, have seen fit that some individuals should be ... detained until they reach their 21st birthday, is that correct?

[Secretary DeVore]: Yes. Yes, Your Honor. I'm aware of that.

[The Court]: And one thing I've heard echoed over and over, when I sat in Juvenile ... is that "Judge, he or she is 18 now. We don't have anything else to offer for them." ... Let them go.... I don't think the legislature intended ... for anyone to reach 18, just to be released, regardless of ... the offense.

[Secretary DeVore]: If that's what you thought I was proposing, Your Honor, I'm certainly not.

[The Court]: I didn't think you were.... What I'm saying is you've looked at the facilities.... You found a lot of them are woefully inadequate.... And you've made a lot of improvement. What steps ... is the Department taking? Or do you have the budget ... to deal with these children, age 17 on. Obviously, when they hit 18, they're not juvenile. I mean they're still under our jurisdiction, but they become adults. And we hear all too often, I believe, that "Judge, there's really nothing else. We've finished the program." .... I guess what I'm saying is the legislature could have said everybody should, once they start a program, should finish a program, and when the program is over, then they should be released. But they didn't say that.... So my question to you is, in the alternative, if the Court doesn't see fit, just given all the alternatives, what would there be for Ms. B.?

In response, DeVore outlined several long-term plans for improving the programmatic capacity of DJS, and some of the

institutional challenges that DJS faced. He also offered comments concerning appellant and his "best thoughts about a transition plan" for her:

[S]peaking on behalf of the Department, we have no intention to shake Julianna loose. We're willing to structure something that we think would be very reasonable to the Court, to continue to maintain accountability of Julianna while we also strive to improve her competence as a student.

\* \* \*

I thought that since she already has this existing relationship with Anne Arundel, given only one course, and since that's in Maryland and we can very closely supervise that, I thought that going to the community college was very appropriate.

And I also think that the elements of this transition plan are, too. And as I said, we're not locked into this plan.... If the Court's concern is that you want our staff to accompany her to college, that's what we will do. If the Court determines that they want a longer period of transition than January for release, then that's what we'll do.

Dr. Hannan, appellant's psychologist at Waxter, testified that he had been appellant's therapist for the past 15 months. In that capacity, he saw her every week for one hour. He noted that appellant also participated in weekly group therapy, and her family has been very involved in her treatment. According to Dr. Hannan, appellant's treatment team recommended appellant's transition to the community.

Dr. Hannan explained that appellant was committed to the "secure unit" at Waxter, a 6 to 12 month program that requires completion of four levels. Describing appellant as a "role model," he noted that she "progressed as quickly as one can to the highest level." Once this "gold" level is achieved, explained Dr. Hannan, the program anticipates transitional home visits. According to Dr. Hannan, such home passes are a "key part of the program at Waxter, involving a slow transition to the community." Concerning home passes, Dr. Hannan stated:

[Appellant] had earned them, according to the requirements of the program, first of all. And I think, also, there was a feeling at that point that she had progressed in her treatment to the point where we didn't really see a whole lot of other things that we could do for her in the facility. And sort of the next logical step would be to begin some transitional visits.

In Dr. Hannan's view, appellant "poses no security concern." He considered appellant quite "impressive," and claimed he had "never seen anyone like [her]." Dr. Hannan also testified that the staff was having difficulty securing sufficient time for appellant on the Center's computer, which appellant needed to continue her college studies.

On cross-examination, the ASA asked Dr. Hannan whether he was aware of the discrepancy between the court's finding that appellant did not act in self-defense and appellant's claim to the contrary. The following colloquy ensued:

[Dr. Hannan]: I think this case has already been tried. . . . What we have tried to do is find out whether there are any anti-social qualities in this girl, and whether she is safe to be in the community. I did not sit through the trial. And *our job here at Waxter is basically to determine whether a girl is safe to reenter the community. And that's the determination that we've made.*

[The Court]: Let me just interject myself. But Doctor, that's an important consideration, is it not? How you, at Waxter are viewing the individual? . . . .

What I did is a matter of public record, and that's why she's there. But when you're determining whether or not she poses a danger and should be released, you obviously, I would think, would have to tick through your mind whether you thought it was justified or not. . . . Are you saying that that doesn't even enter into your consideration?

[Dr. Hannan]: No, it does, sir. But what I would say about that is a person's character is determined on what they do every day. And certainly, there are extraordinary circumstances that people can come across in their life, in which

they would engage in behaviors that are atypical for them. *And it's my assessment that that's what happened here: that we have a girl who was in a situation that was extraordinary, and engaged in a behavior which is not typical for her....* And you know, we've tried to make, we certainly hope for that in all our girls, when we make determinations about their safety to return to the community, *we have left no stone unturned here.* (Emphasis added.)

Appellant's uncle, Nathaniel M., testified that he visits Julianna every Saturday and, after she completed her high school education at Waxter, he worked with her in applying to college. Mr. M. testified that Julianna had been accepted at several colleges, and had received a total of $325,000 in scholarship monies based on "academic excellence."

Niasha John, appellant's DJS case manager, testified that appellant's progress had "been exemplary for the past 17 months." She reported that a home study of appellant's stepfather's home was also satisfactory. Additionally, Ms. John confirmed that appellant had only limited computer access at the Waxter Center.

The State called the victim's mother and uncle to testify as to the effect of the killing on their family. The ASA also offered into evidence the evaluation of appellant conducted by Dr. Estupinan–Kane, dated February 19, 2007.[10] The judge described Dr. Estupinan–Kane as "one of the most outstanding psychologists that I've ever had contact with. And I have no trouble saying that. She's amazing. And the Department is lucky that they still have her."

The evaluation by Dr. Estupinan–Kane included a "Delinquent History" section, which recounted, in detail, appellant's version of the incident, including her claim that she acted in self-defense. Dr. Estupinan–Kane also summarized the re-

---

**10.** The evaluation was received over appellant's objection that the State should have subpoenaed Dr. Estupinan–Kane to testify. Appellant does not press this issue on appeal.

sults of several psychological tests for "Personality/Emotional Functioning" and "Risk Assessment," as follows:

The Revised Children's Manifest Anxiety Scale (RCMAS) is ... designed to assess for the presence of anxiety.... Her scores ... suggest[ ] a reduction in he r overall level o f anxiety.

\* \* \*

The Piers–Harris Children's Self–Concept Scale, Second Edition (Piers–Harris 2) ... generates self-concept and validity scales.... [H]er level of self-esteem is comparable to that of most students in the norming sample.

\* \* \*

The MACI [Million Adolescent Clinical Inventory] is ... designed to assess adolescent personality characteristics and clinical syndromes.... Julianna's MACI was valid although she was not forthcoming in responding to the measure and attempted to present herself in a somewhat unrealistically positive light. Nonetheless, personality patterning reflects an egocentric and potentially attention-seeking adolescent. Julianna's profile suggests that she may appear entitled. Her profile suggests that she is self-confident and she is likely accustomed to admiration and doting by adult figures in her life. She is likely to be strongly self-reliant and may be overly confident that things will work out well *without any need on her part to engage in reciprocal social interactions.* However, her profile also suggests that she has a strong need for affection and thus she may engage in manipulative or attention-seeking behaviors in order to ensure that her needs for attention are met. Julianna's profile suggests that she is likely to be somewhat submissive and that she may avoid condemnation by others by behaving in a controlled and perfectionistic manner. However, angry feelings may occasionally break through her external control. Julianna's profile also suggests that she is somewhat indifferent to the needs and concerns of others.... *A mild predisposition to continued delinquent behavior is suggested.*

* * *

The YLS [Youth Level of Service] is ... designed to assess a youth's level of risk for future delinquent activity. Julianna's score ... suggests *she is at low risk for continued delinquent involvement.*

* * *

The Structured Assessment of Violence Risk in Youth (SAVRY) is a checklist of risk factors derived from the professional literature pertaining to youth violence and allows for consideration of developmental [sic] and the dynamic nature of risk. The SAVRY is comprised of 24 risk items.... Based on systematic review of the risk factors identified by the SAVRY, *Julianna appears to be at low risk for future violence....* (Emphasis added.)

In summary, Dr. Estupinan–Kane made the following observations:

Based on prior assessment, Julianna appears to be functioning in the average range of intelligence.... Overall, Julianna manifests no significant cognitive deficits.

Julianna presents as a likeable and engaging adolescent but testing suggests that she is rather egocentric.... Julianna's primary coping mechanism appeared to be avoidance.... Julianna has maintained appropriate behavior throughout her placements at Noyes Children's Center and Waxter. *She expressed regret for her actions on the day in question but continues to maintain that she was acting in self-defense.* Julianna appeared forthcoming regarding her involvement in physical altercations with peers and admitted that prior to the incident in question she did not view fighting as of significant consequence. Testing suggests Julianna is currently attempting to remain at a distance from emotionally charged situations, which may reflect her realization that overwhelming emotion can cloud her judgment. *Based on her behavior over the last year, Julianna does not appear to be at significant risk for continued aggressive behavior.* She reasonably stated that she does

not think it would be appropriate for her to immediately return to the community.

(Emphasis added.)

Further, Dr. Estupinan–Kane made several recommendations, including the following:

1. Considering the severity of Julianna's prior behavior and her consistent compliance with the rules of placement, *it is felt that a gradual transition from placement to the community would be appropriate.* Julianna requested permission to participate in home visitation with potential later release from Waxter. Thus, *it is recommended that consideration be given to allowing her to have home passes of increasing length* predicated on her appropriate behavior during the passes and the family's compliance with the parameters of the passes. However, Julianna should be directly supervised by an adult at all times while on home pass . . . .

2. It is recommended that Julianna continue participating in individual psychotherapy and sessions be focused on victim impact, accurate recollection [of] the incident in question to the extent possible, dissolution of avoidance as a primary coping mechanism and continued reinforcement of appropriate coping skills.

3. Julianna could derive benefit from completing the online courses she is registered for. It would be beneficial for Julianna to continue her efforts in applying to college.

The court then heard argument of counsel. Counsel for appellant asserted: "There has been not a scintilla of evidence presented in this courtroom that this child has exhibited any threat to anybody in the past 17 months. So we'd ask the Court to begin the institution of home passes." Appellant's counsel also presented "a separation of powers and executive function argument," stating:

[T]he legislature has determined that the Department of Juvenile Services . . . is to administer the program of

reform and rehabilitation and treatment in the juvenile facilities.

* * *

The Department has instituted a program of treatment at Waxter.... Part of the program at Waxter, and a very key component of the program at Waxter, is the institution of home passes. Children cannot complete Waxter's program without participating in those home passes. And this Court has denied her that opportunity.

* * *

I respectfully argue to the Court that it is the Department of Juvenile Services' position, by way of what the legislature has given them in terms of their administration of their program of treatment, to make that determination.

* * *

Waxter can offer her nothing more in terms of rehabilitation and/or treatment, except for the institution of home passes, the beginning of family therapy, and the transition back to the community.

When the Court denied those ... requests, the Court interfered with the executive branch's delegation of powers.

Counsel for DJS argued: "[A]t this time a plan of higher education, family therapy, and gradual community reintegration is the best way to ... accomplish the balance [of the] factors that is envisioned by the statute."

The ASA urged the court to deny the request of DJS and appellant, arguing that "the rehabilitation that [appellant] is currently receiving at Waxter [does not show] that Ms. B. is accepting remorse for what the Court found that she's done." Rather, counsel contended:

It's Ms. B. accepting remorse for just being put in a situation where she ... had no choice but to stab Kanisha Neal. And Your Honor, the facts in the trial showed that was clearly not the case: that she had a knife, had a one-on-one fist fight, and she stabbed Kanisha Neal.

That's what the rehabilitation should be geared to. That's what Ms. B. should be accepting accountability for. And not until she starts to show remorse for that, accepts responsibility for that ... can we ever say that she's being held accountable to the family of Kanisha Neal.

The court then ruled:

I presided over this lengthy trial and read all the reports. And it didn't take much to jog my memory on all of the facts in the case.

Julianna B., born December 18th, 1989. She's 17 years old. She was detained on September 23rd, '05, first at Noyes and then, as we heard, at Waxter. That's been a total of 21 months. If she were to be detained until her 21st birthday, the total would be five and a quarter years. Her life expectancy probably is every bit of 80. So if she were detained till [sic] 21, she would have approximately 59 years left of life.

This murder took place on September 23rd, 2005. Julianna, you were 15 at the time. *In the past 21 months, you have used your time wisely and productively. All reports have been positive,* and I have not heard of any infractions. You have received your high school degree, and you're now taking a college course. You, with the assistance of Waxter and DJS, are preparing yourself academically for the challenges of adulthood. I've even found, with the testimony today, that you are a calming influence at Waxter. So, you're more than an idle participant there; that you are making the best of your situation there.

I have read your psychological reports, prepared by Dr. Kane. Her positive assessments are that you're functioning in the average range of intelligence. *You possess no cognitive deficits. You're likeable, engaging, and don't appear to be at significant risk for continued aggressive behavior.*

*On the negative side, she states that the testing suggests that you're rather egocentric,* and your primary coping mechanism appears to be avoidance. The MACI tests suggest you may appear entitled, and you may engage in

manipulative and attention-seeking behavior, to see that your needs for attention are met. Testing also indicates that you're indifferent to the needs and concerns of others, and *you still maintain that you acted in self-defense.*

A delinquent act means an act which, if the crime was committed by an adult, it would be a crime. If you were 18 when you had committed this second-degree murder, you would be facing up to 30 years at the Department of Corrections.

During your short 15 years in life, before this murder on September 23rd, you exhibited two very distinct and different personalities. One side of you placed you on the honor roll and merited the admiration of several teachers. Your other side was sneaky, dishonest, combative and vulgar. In ninth grade you were suspended for not reporting that your sister and a friend had gone into another girl's locker and took her purse and money. By your own admission, you were involved in three to four physical fights.

On September 9th, just two weeks prior to your encounter with Missy Neal, you, along with some of your friends, followed a mother and her children from the Sherwood game to their car, taunting them. And you personally opened the car door and spit inside at them. As they drove away, you threw a bottle of water at the car and shouted "I'm going to get her. This isn't over."

On September 23rd, 2005, on the night of the incident, you armed yourself with a knife and secreted it on your person. Your fight with Missy was one-on-one.... When Missy was getting the better of you, you plunged your knife into her heart and left her to moan, gag, fall and die.

After you had the presence of mind to pull your dagger from Missy's heart, you proclaimed, boastfully, that you "stabbed that fat bitch."

I found that there was no self-defense. And the police officer's description of you, and the picture taken of you after the fight, corroborated that.

After you returned, you feigned innocence and ignorance. At the police station, you lied, over and over, and even implicated one of your friends, saying that she had given you the knife, which I did not believe.

I don't think you comprehend the catastrophic consequences of your conduct. It's true, most teenagers are self-absorbed. And it's understandable that even someone who is directly responsible for a 15–year–old girl dying would focus primarily on how the incident affected her.

Courts & Judicial Proceedings [§ 3–8A–02] mandates to this Court—and this is by the legislature—what the purposes and the construction of the juvenile justice system is. The juvenile justice system must balance the following: public safety and the protection of the community; accountability of the child to the victim and the community for offenses committed. It must also balance competency and character development, to assist children in becoming responsible and productive members of society.

I think character can best be described as what one does when no one is looking.

I have always divided juvenile cases into two categories. First, juvenile offenses committed by juveniles, such as shoplifting, possession of drugs, assault; car theft; and adult offenses committed by juveniles. Murder is the most egregious of those.

\* \* \*

I have considered strongly the testimony of Mr. Secretary, Mr. DeVore.... I have never heard of the Secretary coming forward. And if you couple his testimony with Dr. Hannon [sic], you have a complete team. You not only have family members, but you have the entire Department of Juvenile Services interested in your case. And I believe that you will be given every opportunity with this treatment team to succeed.

I don't doubt the sincerity of any of the reports, and I don't doubt that the recommendations are not well thought-out by the Departments [sic], and that you've exhibited the

type of conduct where you are, which in their opinion, would require you to take the next step, which would be transition into the community.

And I appreciate Secretary DeVore's interest in your case. And obviously, he'll be taking a fresh look at the Department of Juvenile Services.... It's a tough job.... We ask our schools to do more than they can do, and we certainly ask the Department of Juvenile Services to do, in a lot of the cases, more than they can do.

I think a year, a couple, I guess it was about a year, maybe two years ago, shutting down Hickey was a good first step. But we can't shut down all facilities, because the public does need to be protected, and they need to know that when juveniles commit adult offenses, that society will consider that and they'll consider protection. And although the strong emphasis on a juvenile is to consider rehabilitation, there is also a concern of the community, and accountability. And I read you what the legislature has mandated that this Court consider.

I've considered the safety and protection of the community. People in this county should be able to send their children off to a high school football game on a Friday night without a second thought about their safety.

*Julianna must be accountable. Twenty-one months in detention is woefully inadequate. Missy, her family, and the citizens of this county deserve more accountability than 21 months.*

*Julianna, your character development has a long way to go. I only hope it is fully developed when you turn 21. You do need to develop compassion, selflessness, respect for others, appreciation of life, and an understanding of how lucky you are, and a deep understanding of what your conduct caused.* When you do get released, I want you ready to be a law-abiding citizen, a law-abiding, productive, generous, compassionate, and model citizen.

I certainly don't believe, because one life has been lost, that another one should also be lost. I want you to be well

educated, productive, happy, and a model citizen. I want your adult life to be filled with all the opportunities that this great country affords.

*I am not being punitive, but just.* The responsibility is now on your shoulders, Julianna. You have the choice to make the best of a bad situation. You can focus all your energies on being the best person you can be, or you can spend your time thinking about what you're missing. It's up to you.

*I therefore deny the Department's and the respondent's motion for Julianna to be released into the community, or to have any furloughs or weekend passes or transitions. Julianna is to be held in a secure facility* which will continue to educate her and will continue to build her character. If the Department can't meet these needs now, hopefully, they will continue to strive to give you the opportunity, which they have already done, such as continuing your further education.

... The motion is denied. (Emphasis added.)

Accordingly, on June 18, 2007, the court issued a Continued Commitment and Transportation Order ("CCTO"). It provided, in part:

[T]his Court

**FINDS:**

1. The Respondent is a danger to others.

2. That pursuant to section 3–8A–02 of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland, detention at a secure facility is necessitated.

Therefore it is ...

**ORDERED** that the Respondent ... shall be transported via secure transportation to be detained at Waxter Children's Center under the direction of the Maryland Department of Juvenile Services for continued detention, education, and character development; and it is further

**ORDERED** that the Respondent shall continue to be committed to the Department of Juvenile Services for such

medical, educational, and ordinary treatment as may be determined to be in the Respondent's best interest, subject to further Order of this Court. . . .

We shall include additional facts in our discussion.[11]

## II. DISCUSSION

### A. Statutory Background

We begin our analysis with a review of the statutory framework that governs juvenile delinquency proceedings. Maryland has adopted "a separate system for juvenile offenders, civil in nature." *In re Victor B.*, 336 Md. 85, 91, 646 A.2d 1012 (1994); *see also In re Areal B.*, 177 Md.App. 708, 714, 938 A.2d 43 (2007) ("Juvenile causes are civil, not criminal proceedings."). The Juvenile Causes Act (the "Act"), codified at Md.Code (2006 Repl.Vol., 2007 Supp.), §§ 3–8A–01 *et seq.* of the Courts and Judicial Proceedings Article ("C.J."), "grant[s] jurisdiction in juvenile courts over young offenders and establish[es] the process for treating them, to advance its purpose of rehabilitating the juveniles who have transgressed to ensure that they become useful and productive members of society." *Lopez–Sanchez v. State*, 155 Md.App. 580, 598, 843 A.2d 915 (2004), *aff'd*, 388 Md. 214, 879 A.2d 695 (2005), *cert. denied*, 546 U.S. 1102, 126 S.Ct. 1042, 163 L.Ed.2d 876 (2006). *See also In re John M.*, 129 Md.App. 165, 189–90, 741 A.2d 503 (1999). The Act is to be "liberally construed to effectuate [its] purposes." C.J. § 3–8A–02(b). Chapter 11 of the Maryland Rules, titled "Juvenile Causes," contains provisions pertinent to the Act.

Under C.J. § 3–8A–01(*l*), a delinquent act is an act that "would be a crime if committed by an adult." A delinquent child is a child "who has committed a delinquent act and requires guidance, treatment, or rehabilitation." C.J. § 3–8A–

---

11. Appellant also challenged the terms of her continued commitment in a separate *habeas corpus* action. After the circuit court rejected appellant's claim that she was unlawfully confined, she noted a separate appeal to this Court. *See Julianna B. v. Dept. of Juvenile Services*, No. 1545, Sept. Term 2007 (submitted on brief, April 7, 2008).

01(m). C.J. § 3–8A–02(a) sets forth the purposes of the Act with respect to a child who has committed a delinquent act:

(1) To ensure that the Juvenile Justice System balances the following objectives for children who have committed delinquent acts:

(i) Public safety and the protection of the community;

(ii) Accountability of the child to the victim and the community for offenses committed; and

(iii) Competency and character development to assist children in becoming responsible an d productive members of society;

\* \* \*

(4) To provide for the care, protection, and wholesome mental and physical development of children coming within the provisions of this subtitle; and to provide for a program of treatment, training, and rehabilitation consistent with the child's best interests and the protection of the public interest;

(5) To conserve and strengthen the child's family ties and to separate a child from his parents only when necessary for his welfare or in the interest of public safety;

(6) If necessary to remove a child from his home, to secure for him custody, care, and discipline as nearly as possible equivalent to that which should have been given by his parents;

(7) To provide to children in State care and custody:

(i) A safe, humane, and caring environment; and

(ii) Access to required services. . . .

■ A finding of delinquency embodies a two-step process: an adjudicatory hearing, under C.J. § 3–8A–18, at which "the allegations . . . that the child has committed a delinquent act must be proved beyond a reasonable doubt," and a later disposition hearing, under C.J. § 3–8A–19, to determine "(1) Whether a child needs or requires guidance, treatment, or rehabilitation; and if so (2) The nature of the guidance, treatment, or rehabilitation." C.J. § 3–8A–01(p). We ex-

plained in *In re Charles K.*, 135 Md.App. 84, 761 A.2d 978 (2000):

"The process by which a child is determined to be delinquent consists of a two-step procedure: an adjudicatory hearing, then a disposition hearing. Only after the adjudicatory judge finds that the child has committed a delinquent act and the dispositional judge finds that the juvenile is in need of guidance, treatment or rehabilitation, can a juvenile be classified as a 'delinquent child.' "

*Id.* at 93–94, 761 A.2d 978 (quoting *In re George V.*, 87 Md.App. 188, 190–91, 589 A.2d 521 (1991)) (emphasis deleted from *Charles K.* and *George V.*).

In making its disposition, the court has a range of options that it may consider. One option is provided by C.J. § 3–8A–19(d)(1)(ii), which states, in part, that the court may "commit the child to the custody ... of the Department of Juvenile Services ... *on terms that the court considers appropriate to meet the priorities set forth in [C.J.] § 3–8A–02* ... including designation of the type of facility where the child is to be accommodated...." (Emphasis added.) Alternatively, the court may place the child on probation or under supervision, C.J. § 3–8A–19(d)(1)(i); order the child and/or parents to participate in rehabilitative services; C.J. § 3–8A–19(d)(1)(iii); or commit the child to the custody of the Department of Health and Mental Hygiene or another public or licensed private agency. C.J. § 3–8A–19(d)(1)(ii). C.J. § 3–8A–19(c) provides: "The priorities in making a disposition are [to be] consistent with the purposes specified in § 3–8A–02...."

In addition, on disposition the court "may adopt a treatment service plan...." C.J. § 3–8A–19(d)(2). A treatment service plan is "a plan recommended at a disposition hearing ... by [DJS] to the court proposing specific assistance, guidance, treatment, or rehabilitation of a child." C.J. § 3–8A–20.1(a)(1). If the court adopts a treatment service plan, DJS "shall ensure that implementation of the ... plan occurs within 25 days after the date of disposition," and "shall certify in writing to the court within 25 days after the date of

disposition whether implementation ... has occurred." C.J. § 3-8A-20.1(b)(1), (3). As noted, in the case *sub judice* DJS filed such a certification on January 17, 2006.

Further, the Act provides that, "[i]f the court obtains jurisdiction over a child under this subtitle, that jurisdiction continues until that person reaches 21 years of age unless terminated sooner." C.J. § 3-8A-07(a). In addition, an order committing a child to the custody of DJS "is effective for an indeterminate period of time," subject to the limitations that it may not exceed three years from the date entered (although it may be renewed by the court on its own motion or that of DJS), and that it is no longer effective after the child reaches 21 years of age. C.J. § 3-8A-24. Moreover, under certain conditions, C.J. § 3-8A-26 authorizes the court to "make an appropriate order directing, restraining, or otherwise controlling the conduct of a person who is properly before the court under this subtitle."

## B. Motion to Dismiss Appeal

We first consider the State's motion to dismiss this appeal. The State contends that "[t]he juvenile court's discretionary ruling declining to alter the disposition in Julianna B.'s case does not constitute a final appealable order." But, the State's brief is devoid of any reason or explanation for this conclusory assertion.[12]

---

**12.** The State cites *In re Levon A.*, 124 Md.App. 103, 122–25, 720 A.2d 1232 (1998), for the proposition that "[t]he final, appealable order in a delinquency case is the juvenile court's disposition." But, *Levon A.* did not concern a juvenile court's decision declining to modify or vacate a prior order. In that case, we distinguished between a master's recommendations and the subsequent order of a juvenile court adopting them, and observed that "the report of the juvenile master was not a final order of the circuit court," *id.* at 121, 720 A.2d 1232, but that it was "the *judge's* final order, not the master's report, recommendations, or proposed order, that [appellants] have challenged here." *Id.* at 122, 720 A.2d 1232 (emphasis in original). In concluding that the juvenile court's order was appealable, *id.* at 123–25, 720 A.2d 1232, we expressed no view on the appealability of a decision by a juvenile court whether to modify or vacate an earlier dispositional order.

At oral argument, we repeatedly asked the State to explain the basis for its position that the CCTO is not reviewable; the State was unable to articulate a clear rationale for its position. The State offered that Title 11 of the Maryland Rules contains "built-in provisions for periodic review" of juvenile commitments, and suggested that unspecified ills would result if every order emanating from that review process were appealable. The State also suggested that the CCTO is analogous to the order of a three-judge panel of the circuit court on review of a criminal sentence. *See* Md.Code (2001, 2007 Supp.), §§ 8–101 *et seq.* of the Criminal Procedure Article. We do not agree with that contention. *Cf. In re Victor B., supra,* 336 Md. at 95–96, 646 A.2d 1012 ("[C]riminal rules of procedure are inapplicable to juvenile proceedings."). In any event, we glean from the State's brief and oral presentation that the State views the CCTO as an interlocutory order because the juvenile court retains revisory power over the disposition.

Appellant responds that the juvenile court's order is appealable, either as a final judgment or as an interlocutory order under C.J. § 12–303(3)(x), which permits the appeal of any order "[d]epriving a parent, grandparent, or natural guardian of the care and custody of his child, or changing the terms of such an order." [13]

To the extent that the State's argument suggests that the continued jurisdiction and revisory power of the juvenile court precludes review of its denial of the motion to modify the disposition, we reject the contention. We conclude that the CCTO here is an appealable final judgment. We explain.

Generally, an appellate court obtains jurisdiction only when an appeal is taken from a final judgment entered in the

---

13. Certain interlocutory orders are appealable under C.J. § 12–303. Moreover, the common law "collateral order doctrine" permits review of non-final orders in certain circumstances. *See, e.g., County Comm'rs for St. Mary's County v. Lacer,* 393 Md. 415, 427–31, 903 A.2d 378 (2006). Because we determine that the CCTO is appealable under § 12–301, we need not determine whether § 12–303 or the collateral order doctrine apply.

trial court. C.J. § 12–301 ("The right of appeal exists from a final judgment...."). *See Taha v. Southern Mgt. Corp.*, 367 Md. 564, 567, 790 A.2d 11 (2002) *("Taha II"); O'Brien v. O'Brien*, 367 Md. 547, 554, 790 A.2d 1 (2002); *Philip Morris Inc. v. Angeletti*, 358 Md. 689, 713, 752 A.2d 200 (2000). As we said in *Jenkins v. Jenkins*, 112 Md.App. 390, 399, 685 A.2d 817 (1996), *cert. denied*, 344 Md. 718, 690 A.2d 524 (1997), "[t]he longstanding rule in this State deems the existence of a final judgment as a jurisdictional fact prerequisite to the viability of an appeal."

 Maryland Rule 1–202(n) defines "judgment" as "any order of court final in its nature entered pursuant to these rules." *See* Niemeyer and Schuett, Maryland Rules Commentary 486 (3d ed. 2003, 2007 Supp.). A final judgment is one that "terminates the case in the trial court, and for which the court has entered a judgment on the docket." *Taha II*, 367 Md. at 567–68, 790 A.2d 11. *See Claibourne v. Willis*, 347 Md. 684, 691, 702 A.2d 293 (1997); *Board of Liquor License Comm'rs for Baltimore City v. Fells Point Cafe, Inc.*, 344 Md. 120, 127–28, 685 A.2d 772 (1996). If the record suggests that the trial court intends to take further action to dispose of a case on the merits, the order ordinarily is not regarded as final. *See, e.g., Anderson v. Anderson*, 349 Md. 294, 297–98, 708 A.2d 296 (1998) (dismissing an appeal because "the trial judge anticipated further findings and recommendations from [a] master before entering a final judgment"). The Court of Appeals explained in *In re Samone H.*, 385 Md. 282, 297–98, 869 A.2d 370 (2005) (internal citations omitted):

 For the trial court's ruling to be a final judgment it must either determine and conclude the rights of the parties involved or deny a party the means to "prosecut[e] and defend[ ] his or her rights and interests in the subject matter of the proceeding." In considering whether a particular court order or ruling constitutes an appealable judgment, we assess whether any further order was to be issued or whether any further action was to be taken in the case.

 It is well established that the court's original dispositional order in a juvenile delinquency proceeding is a final,

appealable judgment. *See In re George V.,* 87 Md.App. 188, 191, 589 A.2d 521 (1991) ("[A]fter the determination as to appropriate disposition is made ... the Juvenile Court's action become[s] a final judgment."); *In re Sorrell,* 20 Md.App. 179, 184, 315 A.2d 110 (1974) ("The disposition hearing was a final hearing. [A]n appeal to this Court lies...."). This is so, even though the juvenile court has continuing jurisdiction over a juvenile delinquent, C.J. § 3–8A–07(a), and the respondent is not "put out of court."

The appealability of an order modifying, vacating, or declining to modify a juvenile delinquency disposition, however, appears to be a question of first impression in Maryland. To be sure, Maryland appellate courts have decided appeals from such orders. *See, e.g., In re Demetrius J.,* 321 Md. 468, 478–80, 583 A.2d 258 (1991) (on appeal from juvenile court's denial of motion to vacate or modify its order, holding that juvenile court had no authority to dictate particular facility for juvenile's commitment); *In re Leslie M.,* 305 Md. 477, 505 A.2d 504 (1986) (holding that juvenile court "has the authority to vacate a prior order adjudicating a child to be delinquent after the successful completion of a period of probation"); *In re Glenn H.,* 43 Md.App. 510, 406 A.2d 444 (1979) (on appeal from juvenile court's commitment order, entered pursuant to hearing for "review of commitment for placement," reversing and remanding where juvenile was not represented by counsel nor advised of his right to counsel at review hearing). But, those decisions have reached the merits without squarely addressing whether such an order is appealable.[14]

We perceive the CCTO in this case to have been entered pursuant to the court's revisory authority under Rule 11–116. It provides, in part:

---

**14.** In *In re Leslie M.,* 305 Md. at 478, 505 A.2d 504, the Court denied a motion to dismiss the appeal, stating: "[W]e do not view the motions [to revisit prior delinquency findings] as requests for modification; we believe they are motions to vacate." The Court cited no authority for the proposition that denial of a motion to vacate is appealable, but denial of a motion to modify is not appealable.

## Rule 11–116. Modification or vacation of order.

a. **Revisory Power.** An order of the court may be modified or vacated if the court finds that action to be in the best interest of the child or the public except in cases involving commitment of a child to the Department of Health and Mental Hygiene for placement in a State mental hospital. In cases involving such commitment the court shall proceed as provided in Rule 11–115.

b. **Sua sponte or on petition.** The court may proceed under section a. of this Rule on its own motion, or on the petition of any party or other person, institution or agency having supervision or custody of the respondent, setting forth in concise terms the grounds upon which the relief is requested. If the court proceeds on its own motion, the order shall set forth the grounds on which it is based.

c. **Hearing—When required.** If the relief sought under section a. of this Rule is for revocation of probation and for the commitment of a respondent, the court shall pass an order to show cause why the relief should not be granted and setting a date and time for a hearing. The clerk shall cause a copy of the petition and Show Cause Order to be served upon the parties. In all other cases, the court may grant or deny the relief, in whole or in part, without a hearing.... [15]

---

**15.** In responding to the State's Motion to Dismiss, appellant locates the authority for the juvenile court's review in Rule 11–115(c)(3). It requires, in part, periodic review of "[a] commitment order issued under section b of this Rule," to assess whether modification or revision is necessary. Rule 11–115(c)(3), however, applies only to commitments of juveniles to State mental health facilities. The predecessor to Rule 11–115(c) was enacted on an emergency basis in response to *Johnson v. Solomon*, 484 F.Supp. 278 (D.Md.1979), which held unconstitutional "the absence of a mandatory review of *juveniles committed to mental institutions* by juvenile courts," and ordered changes in Maryland's juvenile procedures to address the deficiency. *Id.* at 313 (emphasis added). *See* 68th Report of the Standing Cmte. on Rules of Practice & Procedure (March 19, 1980) (proposing and explaining rationale for rule changes, including the addition of Rule 915(c), later recodified as Rule 11–115(c)).

Accordingly, we must determine whether the court's continued jurisdiction in juvenile cases, coupled with its revisory power, renders the denial of a motion to modify non-final for purposes of appeal.

We pause to point out that in the CCTO the juvenile court never explicitly ordered DJS to deny appellant the privileges that are generally part of its treatment plan, reward system, or behavior modification program, such as home passes and attendance at college. Rather, the court ordered that appellant "be detained at Waxter Children's Center under the direction of [DJS] for continued detention, education, and character development[.]" Nevertheless, it is apparent from the record that DJS, appellant, the State, and the court believed that court approval was required in order for DJS to accord such privileges. Indeed, the review hearing was held to consider the request of DJS and appellant for privileges. And, at the conclusion of its bench opinion, the court stated: "I ... deny the Department's and the Respondent's motion for Julianna to be released into the community, or to have any furloughs or weekend passes or transitions. Julianna is to be held in a secure facility...."

Because the court's CCTO did not expressly allow such privileges, and instead ordered continued detention, the order

---

If read in isolation, Rule 11–115(c)(3) would seem to apply to *any* commitment order. But, we must read this provision in concert with the larger scheme of rules of which it is a part. *See King v. State*, 400 Md. 419, 429, 929 A.2d 169 (2007) (" 'With respect to the interpretation of the Maryland Rules ... [t]he canons and principles which we follow in construing statutes apply equally to an interpretation of our rules.... To prevent illogical or nonsensical interpretations of a rule, we analyze the rule in its entirety, rather than independently construing its subparts.' ") (citation omitted). Rule 11–115(c)(3) is obviously part of Rule 11–115(c), which is titled "Placement in a State mental hospital." Subsections (c)(1) and (c)(2) explicitly pertain to standards for evaluation and commitment to mental health facilities.

The language of Rules 11–115(c) and 11–116(a), the grant of general revisory power over juvenile dispositions (which specifically exempts mental facility commitments "as provided in Rule 11–115"), coupled with the history of Rule 11–115(c)'s enactment, persuade us that Rule 11–115(c)(3) applies only to commitments to State mental health facilities. As appellant was not so committed, it has no application here.

constituted a denial of the requests. The parties understood the clear implication of the court's order: DJS was not permitted to provide Julianna with the privileges that it believed were appropriate to her progress and rehabilitation. Accordingly, we shall consider the CCTO as the functional equivalent of an express directive denying such privileges.[16]

We return to the State's implied suggestion that the CCTO is deprived of finality because of the court's continuing revisory power. Arguably, an enrolled judgment in a civil case is equally "non-final," to a limited degree; under Rule 2–535(a), the court may "exercise revisory power ... over the judgment" on motion filed within 30 days after entry of judgment, and under Rule 235(b), the trial court has revisory power "[o]n motion of any party filed *at any time*," in the event of "fraud, mistake, or irregularity." (Emphasis added.) Yet, the fact that the trial court retains this measure of control over its judgment does not deprive the judgment of finality for appeal purposes. Similarly, child custody and support orders are generally appealable, although such orders may be revised to advance the best interests of the child. *See* Md.Code (2006 Repl.Vol., 2007 Supp.), § 8–103(a) of the Family Law Article ("F.L."). *See, e.g., Frase v. Barnhart,* 379 Md. 100, 112, 840 A.2d 114 (2003). Rule 11–116 is certainly no broader than F.L. § 8–103(a), which grants a trial court revisory power over orders concerning child custody and support.

By analogy, *Frase v. Barnhart,* is instructive as to the appealability of orders entered pursuant to the court's revisory power under Rule 11–116. In the context of contested issues of child custody under the Family Law Article, the

---

**16.** In *In re Justin D.,* 357 Md. 431, 445, 745 A.2d 408 (2000), the Court said: "[I]t is the written order that constitutes the judgment of the court [and therefore] the order itself must be clear and must express the court's decision." The Court explained, *id.* (citation omitted):

"The extemporaneous recitation of multiple or complex rulings from the bench may be fine for letting the parties and their attorneys know what the court's decision is in the case, but as it is the actual judgment that will govern the conduct, fortunes, and affairs of the parties, the court must be especially careful that the judgment itself is clear, complete, and precise."

Court observed, 379 Md. at 111–112, 840 A.2d 114 (some internal citations omitted):

> Child access ... orders are ordinarily of two types. The normal progression of a contested child access case is for there first to be a *pendente lite* determination.... A *pendente lite* order is not intended to have long-term effect....
>
> At some point, hopefully with dispatch, the issue comes before the court for "final" resolution....
>
> Because the court retains continuing jurisdiction over the custody of minor children, no award of custody or visitation, even when incorporated into a judgment, is entirely beyond modification, and such an award therefore never achieves quite the degree of finality that accompanies other kinds of judgments. Nonetheless ... "[a]n order determining custody must be afforded some finality, even though it may subsequently be modified when changes so warrant to protect the best interest of the child." *See also Hardisty v. Salerno*, 255 Md. 436, 439, 258 A.2d 209, 211 (1969) ("[W]hile custody decrees are never final in Maryland, any reconsideration of a decree should emphasize changes in circumstances which have occurred subsequent to the last court hearing."). In *Haught v. Grieashamer*, 64 Md.App. 605, 611, 497 A.2d 1182, 1185 (1985), the Court of Special Appeals observed that such an order, if possessing the other required attributes of finality, was a judgment as defined in Maryland Rule 1–202(n) and was therefore subject to Maryland Rule 2–535.... [17]

As in *Frase*, the original disposition here is not "entirely beyond modification, and such an [order] therefore never achieves quite the degree of finality that accompanies other kinds of judgments." *Id.* Although the court *may* revisit its disposition, there is no guarantee that it will do so at the time

---

**17.** The *Frase* Court concluded that the custody award at issue was a *pendente lite* interlocutory order, because the trial court attached conditions to the award of custody that it explicitly stated would be revisited at a later hearing. *Id.* at 113–15, 840 A.2d 114.

the disposition is entered. *See* Md. Rule 11–116 ("An order of the court *may* be modified or vacated" on court's own motion or that of party or custodian). (Emphasis added.) This bare potential for future modification does not deprive the juvenile court's disposition of finality.

■ In construing Rule 11–116, we look to Rule 2–535 because, in other contexts, we have analogized to the scope of review under Rule 2–535 when considering the reviewability of revisory orders.[18] In *Suber v. Washington Metropolitan Area Transit Authority,* 73 Md.App. 715, 536 A.2d 142 (1988), for example, we considered the appealability of an order of the Worker's Compensation Commission "rescind[ing] and annull[ing]" a prior order in which it had found that a claimant had sustained a compensable, accidental injury in the course of employment. The Commission's authority to revise its prior order derived from the Worker's Compensation Act, which then provided: " 'The powers and jurisdiction of the Commission over each case shall be continuing, and it may, from time to time, make such modifications or changes with respect to its

---

**18.** Although the denial of a motion to revise under Rule 2–535(a) is appealable, *see Southern Management Corp. v. Taha,* 378 Md. 461, 495, 836 A.2d 627 (2003) ("[A] court's power to revise a judgment under Rule 2–535 ... clearly is subject to appellate review."), the appeal is "limited in scope [and] does not serve the normal functions of an appeal from the original judgment." *First Federated Commodity Trust Corp. v. Comm'r of Securities,* 272 Md. 329, 333, 322 A.2d 539 (1974) (construing predecessor rule). As to " '[a]n appeal from the denial of a motion asking the court to exercise its revisory power ... the standard of review is whether the trial court abused its discretion in declining to revise the judgment.' " *Bennett v. State Dept. of Assessments & Taxation,* 171 Md.App. 197, 203, 908 A.2d 759 (2006) (citation omitted). *See Wells v. Wells,* 168 Md.App. 382, 394, 896 A.2d 1082 (2006); *In re Joshua M.,* 166 Md.App. 341, 351, 888 A.2d 1201 (2005).

What the Court said in *In re Adoption/Guardianship No. 93321055,* 344 Md. 458, 687 A.2d 681, *cert. denied sub nom. Clemy P. v. Montgomery Co. DSS,* 520 U.S. 1267, 117 S.Ct. 2439, 138 L.Ed.2d 199 (1997), in the context of Rule 2–535(b), is also relevant: "The denial of a motion to revise ... is appealable, but the only issue before the appellate court is whether the trial court ... abused its discretion in denying the motion. Except to the extent that they are subsumed in that question, the merits of the judgment itself are not open to direct attack." *Id.* at 475–76, 687 A.2d 681 (internal citations and footnote omitted).

former findings or orders with respect thereto as in its opinion may be justified. . . .'" *Id.* at 720, 536 A.2d 142 (quoting Md.Code Ann., Art. 101, § 40(c), now codified at Md.Code (1999 Repl.Vol., 2007 Supp.), § 9–736(b) of the Labor and Employment Article).

The Court observed that the Commission's revisory power was "exceedingly broad, indeed it is 'one of the broadest reopening statutes,'" *Suber*, 73 Md.App. at 720, 536 A.2d 142 (internal citation omitted), and that it " 'gives the Commission a revisory power akin to that available to courts under . . . Maryland Rule . . . 2–535, but without the thirty day limitation'. . . ." *Id.* at 720–21, 536 A.2d 142 (internal citations omitted). Accordingly, we rejected the argument that "since appellant did not appeal the Commission's judgment on the merits, the propriety of the Commissioner's exercise of discretion pursuant to § 40(c) . . . is not now before this Court." *Id.* at 723–24 n. 4, 536 A.2d 142. We said: "Given the similarity between Rule 2–535 and § 40(c), we think the identical principle applies: a decision to modify prior findings and orders, or the denial of same, is appealable and may be overturned upon a showing of abuse of discretion." *Id.*

■ We conclude that an order of the juvenile court modifying or declining to modify a prior disposition is no less final and appealable than the original disposition, so long as the court's decision does not indicate that there is a "further order . . . to be issued or . . . any further action . . . to be taken in the case." *In re Samone H.*, 385 Md. at 298, 869 A.2d 370.[19]

---

**19.** We observe that an order modifying a prior juvenile delinquency disposition pursuant to Rule 11–116 and Subtitle 8A of the Act is unlike a modification of the permanency plan for a child in need of assistance (CINA) under Rule 11–115(d) and Subtitle 8 of the Act, because a permanency plan is subject to mandatory, continuing periodic review, culminating in a final decision in which "commitment is rescinded or a voluntary placement is terminated." C.J. § 3–823(h)(1)(i); *see also* Md. Rule 11–115(d) ("In cases in which a child is committed to a local department of social services for placement . . . the court . . . periodically . . . at intervals not greater than 18 months, shall conduct a review hearing. . . ."). The Court of Appeals's recent decisions concerning the reviewability of decisions altering permanency plans are thus inappo-

To be sure, the potential for future modification remains, as a consequence of the court's continuing jurisdiction under the Act and its revisory power. But, that potential is equally present at the original disposition, yet does not deprive it of finality for purposes of appeal. If the mere fact of the court's continuing jurisdiction and revisory power were sufficient to deprive the court's orders of finality and render them interlocutory, no juvenile court delinquency proceeding would ever produce an appealable final judgment, because the matter would be final only upon the termination of the juvenile court's jurisdiction, at which point any complaint of the respondent would arguably be moot.

In this case, there is no indication, either on the face of the juvenile court's CCTO or in the transcript of the hearing, that there remained any further order to be issued or action to be taken by the court, aside from the notation in the Order that appellant's commitment to the custody of DJS remained "subject to further Order of this Court." Rather, the court considered appellant's motion to revise her disposition and rejected it in full, ordering her "continued detention, education, and character development" in the custody of DJS. Accordingly, we conclude that the CCTO was a final, appealable order under C.J. § 12–301, and shall therefore deny the State's motion to dismiss.

## C. Separation of Powers

The parties dispute the scope of the juvenile court's authority to direct the actions of DJS with respect to privileges accorded to juveniles committed to DJS's custody. The parties' contentions implicate Article 8 of the Maryland Declaration of Rights, which provides that "the Legislative, Executive,

---

site to the case *sub judice*. *See In re Samone H.*, 385 Md. at 315–16, 869 A.2d 370 (holding that modification of a permanency placement plan is an interlocutory order, reviewable under C.J. § 12–303(3)(x) only if it "deprived [a parent] of her right to care and custody of the children or changed the terms of her parental rights" to her detriment); *see also In re Billy W.*, 387 Md. 405, 875 A.2d 734 (2005); *In re Billy W.*, 386 Md. 675, 874 A.2d 423 (2005); *In re Damon M.*, 362 Md. 429, 765 A.2d 624 (2001).

560

and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the function of one of said Departments shall assume or discharge the duties of any other."

Appellant argues that, "[i]n issuing an order prohibiting the Department of Juvenile Services from implementing the program of rehabilitation that the Department has designed for Ms. B ... the juvenile court violated the separation of powers doctrine and the Juvenile Causes Act." Noting that "DJS has determined that Ms. B. should have home passes, passes for outings, and passes to attend college and a gradual transition back to the community," appellant complains that the court has "prohibited DJS from providing a program of treatment and rehabilitation consistent with Ms. B's best interests and access to the services required to meet this end." She asserts:

> Nowhere in the Juvenile Causes Act is the judiciary given the authority to meddle in the rehabilitation program of a juvenile as developed by DJS. This is particularly so when the juvenile court orders the halt to a rehabilitation program. In essence, Judge McGann has ordered DJS to stop doing its job and simply warehouse Ms. B. until her 21st birthday. Judge McGann, as a member of the Judiciary branch, has no constitutional right to encroach upon DJS's Executive branch authority and obligation to provide a program of rehabilitation to Ms. B.

In response, the State argues that the juvenile court explicitly considered the purposes of the Act, including public safety and accountability, and therefore "the record refutes Julianna B.'s contention that the juvenile court's denial of her motion for relief violated the provisions of the Juvenile Causes subtitle." The State also rejects appellant's "assert[ion] that the effect of the juvenile court's order denying her relief is to halt the rehabilitation program developed by DJS." Citing the court's opinion, the State notes that the court "explicitly directed that 'Julianna is to be held in a secure facility which will continue to educate her and will continue to build her character.'" In addition, the court "urged DJS to 'continue to

strive to give [Julianna B.] the opportunity, which they have already done, such as continuing your further education.' " Therefore, the State maintains that the CCTO "is in no respect in contravention of the doctrine of separation of powers or the rationed obligations in juvenile cases" between the judiciary and DJS. However, the State fails to identify the source of the court's authority to micromanage Julianna's day-to-day confinement.

We conclude that the court had the authority to deny the privileges sought by DJS and appellant. We explain.

The Department of Juvenile Services is a "principal department of State government." Md.Code (2007), § 9–201 of the Human Services Article ("H.S."). Its Secretary is a cabinet-level officer who serves at the pleasure of the Governor. H.S. § 9–202. Therefore, DJS is an agency in the Executive branch of State government.

The Department is "the central administrative Department for ... the State juvenile diagnostic, training, detention, and rehabilitation institutions." H.S. § 9–216. It is authorized to "establish and operate the facilities that are necessary to properly diagnose, care for, train, educate, and rehabilitate children who need these services." H.S. § 9–226(a). Each DJS facility operates "under the control and general management of the Department," H.S. § 9–227(a), and is required to "develop special programs that are designed to meet the particular needs of its residents." H.S. § 9–227(d). The authorizing statute lists "the Thomas J.S. Waxter Children's Center," where appellant is presently confined, as one of the facilities operated by the Department. H.S. § 9–226(b)(7).

H.S. § 9–243 pertains to the Department's "relationship to courts." It provides:

**§ 9–243. Relationship to courts.**

(a) *Provision of services.*—If requested by a juvenile court or by any other court in a proceeding that involves the interest of a minor, the Department shall provide the services described in this title.

(b) *Employees.*—The Department shall provide the employees necessary for any services that a juvenile court orders.

(c) *Cooperation with juvenile court.*—The Department shall cooperate with the juvenile court in carrying out the objectives of this title and [the Juvenile Causes Act].

Appellant relies on *In re Demetrius J.,* 321 Md. 468, 583 A.2d 258 (1991), to support her position that the CCTO violated the doctrine of separation of powers. In that case, the court ordered placement of a juvenile delinquent at a private, out-of-state facility, at DJS's expense. *Id.* at 477, 583 A.2d 258. On appeal, DJS challenged the court's authority to designate the specific facility for placement. *Id.* at 478, 583 A.2d 258. The Court considered the language of the Juvenile Causes Act and the Juvenile Services Act (now codified at H.S. §§ 9–201 *et seq.)* and determined that "the legislative scheme shines bright and clear. Governmental rights and obligations in juvenile causes are rationed between the Judiciary Department and the Executive Department." *Id.* at 474, 583 A.2d 258. The Court continued:

If the allegation [of delinquency] has been duly proved, the court may commit the child to the custody of DJS, and, in doing so, may designate the type of facility where the child is to be accommodated. *The court may not, however, designate a specific facility; such designation is the prerogative of DJS.*

This view is entirely consistent with the rights and obligations of DJS and its Secretary. It is difficult to perceive how the functions of DJS could be properly fulfilled if it could not control the monies appropriated to it or which otherwise came into its hands. The 3–year Plan which the Secretary was required to develop, revise, and submit to the Legislature each calendar year would be thrown into utter disarray if the Secretary were obliged to spend the Department's funds as dictated by a court.... *We take into account that it is DJS, not the court, which is charged with administration of the State juvenile, diagnostic, training, detention, and rehabilitation institutions.* DJS could not

properly administer these institutions if it could not control the monies to be spent on them. . . .

\* \* \*

As we have seen, it is the DJS that is authorized by the Legislature to designate "any public or private . . ." [in-state or out-of-state facility] and to spend funds. . . . *The plain language of the statute places these matters within the sound discretion of DJS. There is no indication, expressed or implied, that the discretion may be exercised by a court* or any other agency, entity, or person.

*Id.* at 474–75, 583 A.2d 258 (internal citations omitted) (emphasis added).[20]

Appellant asserts:

The only difference between the interference by the juvenile court with DJS obligations in *Demetrius J.* and here is that, in *Demetrius J.*, the court was clearly trying to *assist* the juvenile; whereas here, the interference is for the purpose of punishing Ms. B. and preventing her rehabilitation. Otherwise, the court's encroachment upon the authority of DJS is the same and thus, the result should be the same: Judge McGann's Order that Ms. B. be denied home passes, passes for outings, and passes to pursue her education, must be vacated.

The State responds that appellant's reliance on *Demetrius J.* is misplaced, claiming: "The concerns over the delegation of budgetary decisions which was [sic] at issue are in no sense presented by Julianna B.'s case." Accordingly, the State maintains that the juvenile court's denial of appellant's request for modification of her disposition was consistent with the Act, and does not offend the separation of powers.

---

**20.** Neither party suggests that the juvenile court's Order facially violates the Act, as in *In re Demetrius J.*, although the CCTO specifically orders appellant to be "detained at Waxter Children's Center," thus dictating the particular facility, rather than the type of facility, to which she is to be committed. Presumably, this is because the Waxter Center is the only facility in the State maintained by DJS that provides a program for secure, residential commitment of girls.

As we shall see, *In re Demetrius J.* does not directly endorse the position of either party in this case. To understand the import of *In re Demetrius J.*, we pause to review the case law and statutory history leading up to that decision.

As the *Demetrius J.* Court recounted, *see id.* at 476–77, 583 A.2d 258, the statute governing juvenile delinquency dispositions was amended during the 1986 General Assembly in response to a trio of cases decided by this Court and the Court of Appeals, beginning with *In re Appeal No. 653*, 277 Md. 212, 352 A.2d 845 (1976). At that time, the disposition statute provided as follows:

"The court may:

(1) Place the child on probation or under supervision in his own home or in the custody or under the guardianship of a relative or other fit person, upon terms the court deems appropriate;

(2) Commit the child to the custody or under the guardianship of the Juvenile Services Administration, a local department of social services, the Department of Health and Mental Hygiene, or a public or licensed private agency."

*Id.* at 216–17, 352 A.2d 845 (quoting Md.Code (1974, 1975 Supp.), C.J. § 3–820(b)) (emphasis omitted).

In *Appeal No. 653*, a consolidated case, the Court reviewed several juvenile court orders committing children to the custody of the Department of Health and Mental Hygiene ("DHMH"), and directing DHMH to place the children in psychiatric residential treatment facilities "separate from adult patients." 277 Md. at 214, 352 A.2d 845. The Court reversed the juvenile court on two interdependent grounds. First, the Court reviewed the statutory provisions governing the standards for juvenile commitment and DHMH facilities, and concluded that "the Legislature had no intention of mandating separate facilities for children and adult patients, and that the matter of separation was for the discretion of [DHMH] officials." *Id.* at 218, 352 A.2d 845. Second, looking

to the disposition statute, the Court said, *id.* at 217, 352 A.2d 845:

> With regard to the question of the juvenile court's authority initially to direct such separation, the language of [the disposition statute] is quite significant. Subsection (1), authorizing the court to place the child on probation or under supervision in his home or under the guardianship of a relative or other person, further authorizes the court to specify such "terms [as] the court deems appropriate." On the other hand, subsection (2), empowering the court to commit a child to, *inter alia,* [DHMH], does not contain the authorization for the court to specify whatever terms it deems appropriate.

Accordingly, the Court concluded, *id.* at 219, 352 A.2d 845:

> As the authority to supervise and manage mental health facilities is vested solely with the officials of [DHMH], and as no statutory provision suggests that those officials must separate adolescents from adult patients, we believe the matter is, at least initially, one of departmental discretion.

*In re Appeal No. 653* was followed by *Maryland State Department of Health and Mental Hygiene v. Prince George's County Department of Social Services,* 47 Md.App. 436, 423 A.2d 589 (1980) (the "Linda G." case), *cert. denied sub nom. Tom and June G. v. Dept. of Health,* 290 Md. 714 (1981), in which we reversed an order of the juvenile court directing DHMH to pay the cost of a juvenile's placement at a private institution. Relying on *Appeal No. 653,* we held that the juvenile court had no authority to issue such an order, because the disposition statute "empowers the court to commit a child to the custody of DHMH; it does not confer upon the court any right to mandate the specific terms of the commitment." *Linda G.,* 47 Md.App. at 445, 423 A.2d 589.

Thereafter, and of import here, we decided *In re George G.,* 64 Md.App. 70, 494 A.2d 247 (1985). There, the juvenile contended that the court was "without authority (1) to sentence him to a 'court controlled commitment' to the Maryland Training School for Boys and (2) to specify that he was not to

be given leave of any kind for a period of six months." *Id.* at 81, 494 A.2d 247. In reversing the juvenile court, we observed: "We have found no similar case where a court ordered a 'court controlled commitment' to the [facility]." *Id.* The Court reasoned that the disposition statute " 'empowers the court to commit a child . . .; it does not confer upon the court any right to mandate the specific terms of the commitment.' " *Id.* at 82, 494 A.2d 247 (quoting *Linda G.*, 47 Md.App. at 445, 423 A.2d 589). "Accordingly," we concluded, "the court was without authority to mandate the terms of appellant's commitment." *In re George G.*, 64 Md.App. at 82, 494 A.2d 247.

In the wake of these three decisions, "a spate of bills was introduced in the 1986 General Assembly," which gave the juvenile court authority to designate a particular facility for placement. *In re Demetrius J.*, 321 Md. at 476, 583 A.2d 258. But, the bills were amended before passage to allow the court to choose only the type of facility. *See* 1986 S.B. 348, H.B. 635. The resulting statutory language, which remains in effect, empowers the court to commit a child *"on terms that the court considers appropriate* to meet the priorities [of the Act], including the designation of the type of facility where the child is to be accommodated. . . ." C.J. § 3–8A–19(d)(1)(ii) (Emphasis added). Thus, the General Assembly legislatively overruled the decisions in *Appeal No. 653, Linda G.*, and *In re George G.*

After reviewing the legislative history of the bills, the *Demetrius J.* Court observed, 321 Md. at 476, 583 A.2d 258:

The question concerning the authority to designate a specific facility resulted in a compromise reflected in the present statute. The statute, as we have seen, permits the court to name the type of facility but generally bestows no authority on the court to specify a particular facility. The compromise was encouraged in significant part by the hope that it would avoid constitutional considerations.

The *Demetrius J.* Court did not, however, construe the scope of the juvenile court's authority, conferred by the General Assembly, to commit a child to DJS *"on terms the court*

*considers appropriate* to meet the priorities [of the Juvenile Causes Act]." C.J. § 3–8A–19(d)(1)(ii) (Emphasis added). Moreover, because the Court determined, on statutory grounds, that the juvenile court had overstepped its authority, it explicitly declined to reach a constitutional question upon which it had granted certiorari: "Whether the separation of powers mandated by Article 8 of the Maryland Declaration of Rights prohibits the legislature from authorizing the juvenile courts to commit delinquent children to specific private facilities...." *In re Demetrius J.*, 321 Md. at 482 n. 8, 583 A.2d 258. Here, the parties' contentions hinge on the extent of the juvenile court's statutory and constitutional authority to direct the terms of a juvenile's commitment—issues left unresolved by *Demetrius J.*

The scope of the juvenile court's dispositional authority has been the subject of remarkably little judicial attention in the years since the Court decided *In re Demetrius J.* We are aware of only two subsequent reported cases in which Maryland appellate courts have considered the scope of the juvenile court's authority to direct the course of action of an agency within the Executive branch of State government. *See In re Roger S.*, 338 Md. 385, 658 A.2d 696 (1995); *In re Nicholas B.*, 137 Md.App. 396, 768 A.2d 735 (2001). In both cases, the appellate court vacated a disposition order of the juvenile court that directed a county board of education to provide services to a child under the court's jurisdiction.

Writing for the Court in *Roger S.*, Judge Raker explained, 338 Md. at 391, 658 A.2d 696:

Although the Board of Education is certainly a public agency, its functions do not include custody or guardianship of children.... If ... the order did not envision custody or guardianship, then it was beyond the power of the court ... because these are the only concerns that the juvenile court is authorized to address under [C.J. § 3–8A–19(d)(1)(ii)].

The Court cautioned: "Although we are mindful that the Juvenile Causes Act is to be construed liberally to achieve its purposes, we are also sensitive to the possible consequences of

an expansive reading.... Even a remedial statute should not be construed so broadly as to create the possibility of 'results that are unreasonable....' " *Id.* at 393, 658 A.2d 696 (citations omitted). Accordingly, the Court concluded that the Act does not "authorize a juvenile court to order a school system to provide educational services." *Id.* at 391, 658 A.2d 696. Echoing that holding, we observed in *Nicholas B.*, 137 Md. App. at 402, 768 A.2d 735, a factually similar case, that the Act "limit[s] the authority of a juvenile court in rendering disposition."

Although both *Roger S.* and *Nicholas B.* confirm that the juvenile court's dispositional authority is limited, they do not speak directly to the case at hand. Both cases considered the juvenile court's authority to direct the conduct of a State agency that does not have custody of a juvenile offender.

The same principle distinguishes *In re David K.*, 48 Md. App. 714, 429 A.2d 313 (1981), and *In re Darius A.*, 47 Md.App. 232, 422 A.2d 71 (1980), cited by appellant; both cases preceded *Demetrius J.* In each case, we held that the juvenile court had overstepped its bounds: in *David K.*, by ordering the suspension of a juvenile's driving privileges, thus usurping the authority of the Motor Vehicle Administration, 48 Md.App. at 724–25, 429 A.2d 313; and in *Darius A.*, by ordering the Department of Social Services to refrain from exercising its statutory and regulatory authority to petition for guardianship, 47 Md.App. at 235–36, 422 A.2d 71. Neither case considered the scope of the juvenile court's authority to govern the conduct of DJS with respect to the court-ordered custody of a juvenile.

Undoubtedly, if the General Assembly had not amended the Act in 1986, this case would be controlled by *In re George G.*, 64 Md.App. at 82, 494 A.2d 247, which held that the juvenile court overstepped its authority with its order mandating a "court controlled commitment" to a DJS facility, and directing DJS to deny a juvenile offender "leave of any kind for a period of six months." As noted, in that case the Court reasoned that the Legislature had not conferred on the court the power

to dictate the terms of commitment. *Id.* But, as we have seen, the General Assembly responded to *George G.* and the two other cases by expressly authorizing the juvenile court to commit a delinquent to DJS "on terms that the court considers appropriate. . . ." C.J. § 3–8A–19(d)(1)(ii).

The question, then, involves construction of the phrase, "on terms that the court considers appropriate. . . ." We need not exhaustively reiterate the well-honed principles of statutory construction that apply to our analysis of the statutory text. In interpreting a statute, we give its words their ordinary and usual meaning. *City of Baltimore Dev. Corp. v. Carmel Realty Assocs.*, 395 Md. 299, 318, 910 A.2d 406 (2006); *Ridge Heating, Air Conditioning and Plumbing, Inc. v. Brennen*, 366 Md. 336, 350, 783 A.2d 691 (2001). The literal meaning of C.J. § 3–8A–19(d)(1)(ii) is clear: the court may specify "terms" of the confinement that it "considers appropriate." The proper application of this language, however, is a far thornier matter. The phrase must be read in light of the statutory scheme of which it is a part. Certainly, such "terms" must comport with the purposes of the Act. But, the question remains as to whether there are any other limits on the court's authority to direct the conduct of DJS.

In *George G.*, the lower court ordered that a juvenile was not to have "leave of any kind for a period of six months." On appeal, this Court ruled that the lower court had no such authority. *In re George G.*, 64 Md.App. at 82, 494 A.2d 247. We are confident that, at a minimum, the Legislature, motivated by our decision in *George G.*, meant to give the juvenile court authority to make a disposition akin to the one that this Court rejected in *George G.* The legislative history of the 1986 amendments confirms this conclusion. The 1986 committee reports for both S.B. 348 and H.B. 635 stated: "The purpose of this bill is to reverse the decision of the Court of Special Appeals [in] *In re George G.*" In identical language, the reports explained:

> Traditionally, the juvenile court has assumed an active role in monitoring the quality of care provided by the various agencies dealing with children. Until recently, it was as-

sumed that juvenile court judges had the prerogatives given to them by this bill. However, in *[In re George G.]*, the Court of Special Appeals ruled that the juvenile court was without authority to mandate the terms of a juvenile's commitment.... This case appears to hold that once a judge commits a juvenile to [DJS], the judge loses control over that child. This decision is inconsistent with prior appellate cases regarding the juvenile court's jurisdiction and has caused confusion in the juvenile system.

Appellant vigorously contends that the determination as to privileges should be made by DJS, because the agency is in favor of them, but the juvenile court is not. The court below determined that appellant was not "to be released into the community, or to have any furloughs or weekend passes or transitions." We conclude that the General Assembly's amendment of the Act, so as to permit the disposition rendered in *George G.*, generally permits a juvenile court to deny or grant the kind of privileges requested here. Indeed, the situation could just as easily arise in which the Department refuses such privileges, and a juvenile requests judicial review in the hope that the court will intervene. If the court had no authority to overrule the Department's decisions concerning the terms of commitment, juvenile offenders would have scant means to challenge those terms.

Moreover, we perceive no constitutional infirmity in the Act based on separation of powers. The juvenile court's order did not implicate the concerns of control over the public fisc identified by the Court in *Demetrius J.*

Three recent cases suggest that the juvenile court may violate the separation of powers if it cedes *too much* authority over a juvenile's placement to an executive agency. *See In re Mark M.*, 365 Md. 687, 782 A.2d 332 (2001); *In re Justin D.*, 357 Md. 431, 745 A.2d 408 (2000); *In re Caya B.*, 153 Md.App. 63, 834 A.2d 997 (2003). In those cases, which concerned children in need of assistance ("CINA"), rather than delinquent children, the appellate courts vacated decisions of the juvenile court delegating authority over parental visitation to

the Department of Social Services ("DSS") *(Justin D.);* the child's state-appointed therapist *(Mark M.);* and the child's aunt and uncle, who had been appointed as custodial guardians by the court *(Caya B.).*

In *Justin D.,* 357 Md. at 449, 745 A.2d 408, the Court noted that the Act permits the juvenile court to commit a CINA to the guardianship of DSS " 'on terms that the court considers appropriate.....' " (Quoting C.J. § 3–820(c)(ii)). In such a situation, "DSS acts, in many respects, as the court's agent in attempting to remedy the problems that led to the CINA finding and removal of the child.... DSS ... needs to be given sufficient authority and flexibility to carry out its function." *Id.* But, the Court cautioned that "the court has a clear and continuous supervisory role to play." *Id.* "Even in this setting," the Court explained, "the court may not delegate its responsibility to determine the minimal level of appropriate contact between the child and his or her parent ... and ... may not permit DSS to curtail ... the visitation allowed in the court order." *Id.*

In *Mark M.,* 365 Md. at 706, 782 A.2d 332, the Court held that the juvenile court was under an even more stringent bar to delegation in CINA cases when there is evidence that the child has been abused. In such a case, an order that "visitation will *not* occur until [the child's] therapist recommends it" was deemed an impermissible delegation. *Id.* at 707, 782 A.2d 332. The Court explained, *id.* at 708, 782 A.2d 332 (emphasis in original):

[W]hen a court has reasonable grounds to believe that abuse has occurred ... visitation *must* be denied *unless* that court specifically finds that there is no likelihood of further abuse or neglect. In cases where prior abuse is evidenced, the statutory mandate is that *the court* make this specific finding. The court cannot delegate this determination to a non-judicial agency or an independent party.

We do not suggest that *Justin D.* and its progeny control this case, or that it would have been impermissible for the court to have given DJS discretion over whether appellant

could be granted day passes or privileges to attend community college. *Justin D.* and its progeny concern parental visitation, not leave for delinquent children, and deal with CINA cases, in which there are, as the *Mark M.* Court noted, specific statutory commands that the court make visitation determinations. There is no such explicit reservation of exclusive authority to the juvenile court in the delinquency context. Rather, we cite *Justin D.* as a reminder that separation of powers runs in both directions: it may be implicated by ceding too much *or* too little authority.

In addition, the Act mandates that the court consider "[p]ublic safety and the protection of the community" in its disposition. C.J. § 3–8A–02(a)(1)(i). Circumstances certainly exist in which the release of a particular juvenile offender could jeopardize the safety of the community. If the court were deprived of the authority to mandate the terms of a juvenile's commitment, including genuine confinement, when appropriate, the court could not satisfy its statutory mandate to further the purposes of the Act.

For these reasons we reject appellant's argument that the juvenile court had no authority to issue an order overriding the Department's judgment with respect to the terms and conditions of her confinement.

### D. Abuse of Discretion

Our determination that it is within the juvenile court's power to render a disposition that denies various privileges, such as home leave, does not complete our inquiry. We must next consider appellant's contention that, even if the juvenile court has discretion to bar such privileges, the court abused its discretion in this instance.

Appellant maintains that the juvenile court "abused its discretion . . . in ordering that she not receive home passes or be permitted to attend college solely as a punitive measure." She argues that the court disregarded uncontested evidence at the hearing that appellant is not a danger to others, and had earned the passes through exemplary behavior as a "critical

part of her program of rehabilitation." Appellant recounts, at length, the juvenile court's various comments, arguing that "[i]t is clear from the actions of and statements by [the judge] that his decision regarding Ms. B.'s detention is not, in fact, to see that she is rehabilitated but, rather to punish her."

Moreover, appellant maintains that she is "being denied her due process rights to a fair review by an impartial arbiter." Citing *In re Thomas J.*, 372 Md. 50, 811 A.2d 310 (2002), she suggests that the juvenile court's decisions have denied her due process, because the court's "refusal to allow Ms. B. to have the passes necessary to further her program of rehabilitation, in contravention of all recommendations of every member of her treatment team, and in the absence of any evidence demonstrating why Ms. B. should be so constrained, demonstrates an appearance of, as well as, actual unfairness and a lack of impartiality." [21]

In response, the State reiterates that the juvenile court explicitly considered the purposes of the Act in making its decision, and also "considered strongly" the testimony of the Secretary of DJS and the other professionals who evaluated appellant. In its view, the court "appropriately noted negative aspects of the psychological and assessment reports," including that appellant continued to maintain that she acted in self-defense, her "primary coping mechanism appears to be avoidance," and she is "indifferent to the needs and concerns of others." According to the State, the court expressly based its disposition on the need for appellant to achieve further "character development" and to demonstrate "accountability," which are both within the purposes of the Act. Moreover, it underscores that the court concluded its bench opinion by stating, "I am not being punitive, but just."

 Under the circumstances of this case, we agree with appellant. The court's mere recitation that it was "not being

---

21. On this basis, appellant urges that, if we remand for a new review hearing, we should "order that the hearing take place before a judge other than Judge McGann who has proven himself unable to remain impartial regarding Ms. B.'s needs." We decline to do so.

punitive" does not overcome the balance of the record before us, which demonstrates that the court's disposition was, in fact, intended to punish appellant; was at odds with the views of the professionals, all of whom indicated that appellant does not pose a danger to others and that transition to the community was appropriate; and was contrary to the central rehabilitative goal of the Act. We explain.

In Maryland, juvenile confinement is aimed at rehabilitating and treating juvenile offenders, rather than punishing them. In *Smith v. State*, 399 Md. 565, 580, 924 A.2d 1175 (2007), the Court said: "[W]e have repeatedly noted that the Legislature intended the juvenile justice system to be 'guided generally by principles of protection and rehabilitation of the individual rather than a societal goal of retribution and punishment.'" (Internal citation omitted.) Indeed, " '[t]he *raison d'etre* of the Juvenile Causes Act is that a child does not commit a crime when he commits a delinquent act. . . . He is not to be punished but afforded supervision and treatment to be made aware of what is right and what is wrong. . . .' " *In re William A.*, 313 Md. 690, 695, 548 A.2d 130 (1988) (quoting *In re Davis*, 17 Md.App. 98, 104, 299 A.2d 856 (1973)). To that end, delinquency cases are civil, not criminal, proceedings. *In Re Victor B.*, 336 Md. at 91, 646 A.2d 1012.

Numerous cases support the view that rehabilitation, not punishment, is a central goal of the Act. In *Smith v. State, supra*, 399 Md. at 584, 924 A.2d 1175, for example, the Court determined that "once the criminal court transferred jurisdiction of case to the juvenile court for disposition," the juvenile court was not permitted to remand to the criminal court "when frustrated with the juvenile's progress," because to do so would "obviate the legislative intent to transfer the juvenile's case in order to engage in the rehabilitation progress." *See also Moore v. Miley*, 372 Md. 663, 673, 814 A.2d 557 (2003) ("[T]he keystone of Maryland's disposition of juvenile delinquents is that the 'moral responsibility of blameworthiness of the child [is] of no consequence,' such that delinquency adjudication is seen as the opportunity for the State to

provide needed rehabilitative intervention."); *In re Johnson,* 254 Md. 517, 523, 255 A.2d 419 (1969) ("The proceedings of a juvenile court are not criminal in nature, and its dispositions are not punishment for crime."); *Moquin v. State,* 216 Md. 524, 529, 140 A.2d 914 (1958) ("[Juvenile] detention is not by way of punishment for a crime, but is preventive and therapeutic."); *In re McNeil,* 21 Md.App. 484, 497, 320 A.2d 57 (1974) (noting that "the special concerns expressed in our juvenile law [are] not merely meaningless, high sounding phrases").

To be sure, "[t]he matter of disposition in a juvenile case is committed to the sound discretion of the juvenile judge...." *In re Hamill,* 10 Md.App. 586, 592, 271 A.2d 762 (1970). But, a judge may abuse his discretion if his disposition is guided solely by the delinquent act itself, and is impermissibly punitive, without giving proper consideration to the child's rehabilitative needs and best interests. *See id.; See also In re Appeal No. 179,* 23 Md.App. 496, 327 A.2d 793 (1974).

Indeed, this principle is evident on the face of the Act, because the court may not even find the child "delinquent" without considering the child's need for rehabilitation. Put another way, the need for rehabilitation is a statutory *sine qua non* of delinquency. We made this clear in *In re Charles K.,* 135 Md.App. 84, 94, 761 A.2d 978 (2000) (emphasis added), when we said: "[W]hen a juvenile court finds ... that a juvenile has committed a delinquent act, the child is not necessarily delinquent. The Act establishes by its terms two co-equal conditions that combine to establish delinquency under the statute: a delinquent act *and a current need for services.*" We held that the juvenile court erred in finding the child delinquent, because the juvenile court expressly found that he was not in need of services or treatment. *Id.* at 99, 761 A.2d 978.

Several cases have held that the juvenile court abused its discretion when it committed a child solely or primarily on the basis of the child's delinquent act or because the disposition was in the nature of criminal punishment. *See, e.g., In re*

*Appeal No. 179, supra,* 23 Md.App. 496, 327 A.2d 793; *In re Roberts,* 13 Md.App. 644, 651, 284 A.2d 621 (1971) (Where juvenile court did not hold separate disposition hearing, "[i]t appears clear ... that the trial judge based his disposition primarily on the nature of the delinquent act itself...."); *In re Arnold,* 12 Md.App. 384, 278 A.2d 658 (1971) (Where adjudicatory and disposition hearings were "interwoven," there was "no showing that the legislative design was weighed or considered by the juvenile judge, nor does the record disclose ... how the children's 'welfare' or 'the interests of public safety' would be best served by commitment to the Maryland Training School."); *In re Hamill, supra,* 10 Md. App. 586, 271 A.2d 762.

*In re Wooten,* 13 Md.App. 521, 284 A.2d 32 (1971), is particularly instructive. There, the juvenile court found that a sixteen-year-old had assaulted a woman by "closing her arm in her automobile door, and by striking her repeatedly about the left breast and ribs." *Id.* at 523, 284 A.2d 32. The court characterized the assault as "atrocious," and immediately adjudicated the child delinquent, committing him to a DJS facility, without holding a separate disposition hearing. *Id.* at 525, 284 A.2d 32. The lower court stated that "because of appellant's middle class advantages he 'should be held to a higher degree of accountability' for his actions." *Id.* (quoting juvenile court). In vacating the disposition order, this Court noted that "the proceedings of a juvenile court ... are not punishment for crime," *id.* at 527, 284 A.2d 32, and that "the mere fact of delinquency does not by itself warrant commitment of a juvenile to a training school." *Id.* at 528, 284 A.2d 32. We explained:

> *Indeed, to otherwise conclude would render meaningless the highsounding provisions of the juvenile law which entreat the juvenile judge in making disposition not to think in terms of the juvenile's guilt, not to punish him for his delinquent acts, but rather to assess his need for supervision, treatment, or rehabilitation and thereafter make disposition under [the Act] "most suited to the physical, mental and moral welfare of the child."*

We think the juvenile judge in this case failed fully to appreciate and apply these principles in taking appellant from his parents and committing him to a training school.... *However relevant the nature of the delinquent act and the circumstances surrounding its commission may be in making a proper disposition, those factors cannot be applied without regard to, or wholly apart from, the child's best interests and those of the public viewed in light of the purposes underlying the juvenile law. In other words, to make disposition 'most suited to the physical, mental and moral welfare of the child'* ... *requires that the juvenile judge consider more than the delinquent act itself, no matter how extreme or violent it may have been....* Moreover, the record fails to reflect that the court, in making its disposition, had in mind that Maryland law clearly contemplates the retention of a delinquent child in his home where possible, consistent with his own as well as the public interests. [T]he Legislature has indicated its preference that a delinquent child be placed in the care, custody and control of individuals, rather than an institution whenever consistent with the purposes underlying the juvenile law, and that a commitment to a training school in a case where the parents would seem able and willing to undertake the rehabilitation of the delinquent child would be improper.... [T]he record before us contains nothing to indicate or suggest that appellant's physical, mental and moral welfare would be served by separating him from his parents and committing him to a training school. Recognizing that the matter of disposition in a juvenile case is committed to the sound discretion of the juvenile judge, to be disturbed on appeal only upon a finding that his discretion has been abused, we find an abuse of discretion in this case....

*Id.* at 528–29, 284 A.2d 32 (internal citations and footnote omitted; emphasis added)

*In re Hamill, supra,* 10 Md.App. 586, 271 A.2d 762, also provides guidance. In that case, a seventeen-year-old boarding student had sold marijuana to an undercover police officer.

*Id.* at 587, 271 A.2d 762. At the disposition hearing, the juvenile stated that she had possessed the drug only for her own use, but decided to rid herself of it because school administrators were searching rooms. *Id.* Her roommate arranged a meeting with a "friend," who in fact was the undercover officer. *Id.* at 587–88, 271 A.2d 762. The juvenile testified that, before selling the marijuana to the officer, she initially offered to give it to him for free. *Id.* The judge commented, "Well, I do not know whether or not I am going to confine this girl or not. It is going to depend on my confirmation when I talk to Officer Bays. If she is telling the truth ... that will be one thing. If she is lying, that will be something else...." *Id.* at 588, 271 A.2d 762. The officer then testified that the juvenile had sold him the drug without offering it as a gift, and had also insinuated that she could procure more for him. *Id.* The court also heard the testimony of the young woman's father, who testified that he was "confident" she could be rehabilitated without commitment outside the home. *Id.* The report of the Juvenile Probation Department, which was received in evidence, noted that the juvenile seemed "more remorseful at having been caught selling the drug than in having used it occasionally," but nonetheless concluded that she had "learned a lesson from this experience and will not be before the Court again." *Id.* at 588–89, 271 A.2d 762.

In committing the juvenile to a DJS facility, the court stated, *id.* at 589–90, 271 A.2d 762:

"The court certainly has some grave responsibilities in cases of this sort, from the standpoint of all elements of society that are involved, the community, the children, the girl that is charged with being delinquent here, the parents, all of these things have to be considered.... The evidence is uncontradicted and undisputed that ... another deal might be arranged, which indicates more than just a single incident. The Court realizes full well that it is a calculated risk to commit a girl of this age and that there is a possibility of danger to her and to her future; but there is certainly a greater danger to society and that danger is so

great that the court believes that the risk must be taken...."

This Court vacated the disposition. Citing *Moquin v. State, supra,* 216 Md. 524, 140 A.2d 914, we observed that "the juvenile act does not contemplate the punishment of children where they are found to be delinquent, but rather an attempt to correct and rehabilitate them in 'a wholesome family environment whenever possible,' although rehabilitation may have to be sought in some instances in an institution." *In re Hamill,* 10 Md.App. at 591, 271 A.2d 762. We recognized that "it is altogether clear that the *mere* fact of delinquency, without more, ordinarily does not justify the taking of the child from his parents and his commitment to a State training school." *Id.* (emphasis in original). Further, we said:

*It is not apparent that the juvenile judge ... gave proper weight to the testimony of the father and the opinion of the juvenile probation department that it seemed unlikely that Leigh would offend again.* On the cold record before us, there is nothing that would seem to indicate, nor is there anything to suggest that Leigh's physical, mental, and moral welfare would be served by separating her from her parents and committing her to the training school.

\* \* \*

*We find evidence of an abuse of discretion* in failing to weigh the evidence as to probable rehabilitation outside an institution....

*Id.* at 592–93, 271 A.2d 762 (internal citations omitted; emphasis added)

*In re No. 1140,* 39 Md.App. 609, 387 A.2d 315 (1978), also speaks to the case at bar. There, we held that a disposition was impermissibly punitive when it required a minimum period of confinement.

In that case, the juvenile court committed a delinquent to a DJS facility "for an indefinite period, subject to a minimum committal to that institution of one year." *Id.* at 610, 387 A.2d 315. On appeal, we considered whether the court had "authority to prescribe a minimum period of confinement[.]" *Id.*

We analyzed the court's disposition in light of the provision of the Act that governed the period of time a disposition order remained effective. *Id.* That provision, currently codified at C.J. § 3–8A–24,[22] dictates that a disposition order vesting custody of a juvenile "is effective for an indeterminate period of time," C.J. § 3–8A–24(a), subject to the limitations that the order may not exceed three years unless renewed by the court, C.J. § 3–8A–24(b), and that it terminates when the child turns 21 years of age. C.J. § 3–8A–24(c). Citing the then-current codification of the Act and rules, we noted that the court has continuing jurisdiction over a delinquent child, *see* C.J. § 3–8A–07(a); that the court may require periodic progress reports from the child's custodian, including recommendations for further treatment or rehabilitation, *see* C.J. § 3–8A–25(3); and that the court possessed authority to modify or vacate its disposition at any time, *see* Md. Rule 11–116. *In re No. 1140,* 39 Md.App. at 612, 387 A.2d 315.

When we considered the statutory scheme in light of the purposes of the Act, we concluded that the juvenile court was not permitted to mandate a minimum period of confinement. We explained, *id.* at 612–13, 387 A.2d 315:

The[ ] provisions [of the Act and Rules] indicate that the dispositional process is directed toward the termination of a committal or other disposition when the juvenile court finds the child to be rehabilitated, and directed away from setting mandatory periods of commitment, which would be more in the nature of punishment.

Read in light of the expressed purposes of the juvenile justice process, and the procedures created, the intent of [the Act] is clear. The juvenile court may not impose a minimum period of commitment on a juvenile who has been adjudicated delinquent.

\* \* \*

Such a reading is also entirely consistent with the purposes [of the Act], which envision a release from commitment or

---

22. At the time, the relevant provision was codified at Md.Code (1974), C.J. § 3–825.

probation when rehabilitation of the juvenile has been accomplished.[23]

In the foregoing cases, we indicated that the proper course for the juvenile court is to consider the disposition in light of the statutory objectives set forth in C.J. § 3–8A–02(a).[24] We have found "abuse of discretion in failing to weigh the evidence as to probable rehabilitation outside an institution...." *In re Hamill,* 10 Md.App. at 593. *See also In re No. 1140,* 39 Md.App. at 611, 387 A.2d 315; *In re Appeal No. 179,* 23 Md.App. at 500, 327 A.2d 793; *In re Roberts,* 13 Md.App. at 650–51, 284 A.2d 621; *In re Wooten,* 13 Md.App. at 529 & n. 1, 284 A.2d 32; *In re Arnold,* 12 Md.App. at 391–92, 278 A.2d 658. As we stated in *In re Christiana G.,* 72 Md.App. 443, 447–48, 530 A.2d 771 (1987) (internal citations omitted; emphasis added):

The[ ] options available to the judge in making a disposition must be considered *in pari materia* with the legislatively declared purpose of our juvenile code....

---

**23.** Although *In re No. 1140* was decided before the 1986 amendments to the Act, discussed *supra,* the Legislature's authorization for the court to commit a juvenile on "terms [it] considers appropriate" did not overrule our holding that the court may not order a minimum term of commitment. The legislative history of the 1986 amendments does not mention *In re No. 1140,* and our decision in that case was based on the interpretation of legislative provisions that were not amended by the 1986 enactment and remain in force. In particular, we based our decision on our interpretation of the statutory requirement (now codified at C.J. § 3–8A–24(a), but substantively unchanged) that "an order ... vesting legal custody in an ... agency ... is effective for an indeterminate period of time." *See In re No. 1140,* 39 Md.App. at 612–13, 387 A.2d 315. We said, *id.* at 613, 387 A.2d 315 (emphasis in original):

If indeterminate is read to mean, as the State would have it, *only* that no maximum period of commitment may be ordered, the use of "indeterminate" is rendered practically nugatory.

\* \* \*

If "indeterminate" is read to mean that no minimum period of commitment may be ordered, however, the term is meaningful in the context of [then] § 3–825, read as a whole.

**24.** *See* page 547, *supra.*

* * *

Thus, the nature of the disposition is committed to the sound discretion of the court; *but that discretion is limited where a child is removed from his or her parents. That option should be exercised only "for the most urgent reasons."*

Turning to this case, we reject the State's claim that the juvenile court "correctly effectuated the purposes of juvenile proceedings." We conclude that the juvenile court's disposition did not accord with the statutory principles. What we said in *Ward v. Ward*, 52 Md.App. 336, 343, 449 A.2d 443 (1982), albeit in another context, is apt: "[I]t is clear from the record that the [court] gave no more than lip service to the [statutory] factors." We elaborate.

In its discussion of the statutory factors in the Act, the court stated:

Courts & Judicial Proceedings [§ 3–8A–02] mandates to this Court—and this is by the legislature—what the purposes and the construction of the juvenile justice system is. The juvenile justice system must balance the following: public safety and the protection of the community; accountability of the child to the victim and the community for offenses committed. It must also balance competency and character development, to assist children in becoming responsible and productive members of society.

The court recounted the subfactors contained in C.J. § 3–8A–02(a)(1). But, it omitted to mention or analyze the factors contained in subsections (4), (5), (6), and (7), *supra*, which limit the court's discretion. *In re Christiana G.*, 72 Md.App. at 447, 530 A.2d 771. Moreover, the court spoke of its interest in confining appellant for the maximum time permitted, *i.e.*, until she reached the age of 21, based largely on the grievous nature of her offense. For example, during the hearing, the court made the following statements:

I'm sure you're acutely aware that the legislature, in their wisdom, have seen fit that some individuals should be ... detained until they reach their 21st birthday.... I don't

think the legislature intended ... for anyone to reach 18, just to be released, *regardless of ... the offense.*

\* \* \*

She [has been] detained ... a total of 21 months. If she were to be detained until her 21 st birthday, the total would be five and a quarter years. Her life expectancy probably is every bit of 80. So if she were detained til 21, she would have approximately 59 years left of life.

\* \* \*

If you were 18 when you had committed this second-degree murder, you would be facing up to 30 years at the Department of Corrections.

\* \* \*

Julianna, your character development has a long way to go. *I only hope it is fully developed when you turn 21.*

\* \* \*

Julianna must be accountable. *Twenty-one months in detention is woefully inadequate. Missy, her family, and the citizens of this county deserve more accountability than 21 months.* (Emphasis added).

Then, immediately before the judge rendered judgment, he said:

[A]lthough the strong emphasis on a juvenile is to consider rehabilitation, there is also a concern of the community, and accountability....

I've considered the safety and protection of the community. People in this county should be able to send their children off to a high school football game on a Friday night without a second thought about their safety.

At the review hearing, the court heard unrefuted evidence of appellant's continued exceptional behavior and consistent non-violent conduct over her 21 months of confinement. It also heard opinions of the DJS professional staff and independent experts, who uniformly agreed that appellant is ready for home passes, is unlikely to recidivate, and presents no threat to others. Nevertheless, the court seemed intent to impose

maximum confinement upon appellant because of the grievous nature of the offense, and until her "character development" progressed to the point that she conformed her personal account of Ms. Neal's murder to the court's legal and factual findings, and ceased to "maintain that [she] acted in self-defense." [25]

Our precedents make plain, however, that "the dispositional process is directed toward the termination of a commitment or other disposition when the juvenile court finds the child to be rehabilitated, and directed away from setting mandatory periods of commitment, which would be more in the nature of punishment." *In re No. 1140*, 39 Md.App. at 612, 387 A.2d 315. The court's statements reveal its focus on the delinquent act itself, and its intention to commit appellant until the age of 21, because of the nature of her offense.

In addition, the court's analysis of the statutory factors that it did consider was critically flawed in several respects. First, the court's comment that 21 months of detention was "woefully inadequate" reveals that the court erroneously equated "accountability" with maximum confinement. Second, the court's findings as to public safety were entirely retrospective, based solely on the nature of the crime. The court recounted the gruesome facts of appellant's offense at some length and the court commented, "I don't think you comprehend the catastrophic consequences of your conduct." But, the court's factual finding in its CCTO, that "Respondent is a danger to others," did not reflect the uncontroverted evidence presented to the court that, *at the present time,* appellant does not present a risk of violence. Notably, in every case in which we have vacated the juvenile court's disposition with respect to a delinquent child, we have explicitly instructed the juvenile court, on remand, to consider "the minor [appellant's] conduct *since the original hearing....*" *In re Arnold,* 12 Md.App. at 397, 278 A.2d 658 (emphasis added). *See also In re Appeal*

---

**25.** At the time of the hearing in this case, we had not yet rendered our decision in *Julianna I,* in which appellant contended that her actions constituted self-defense.

*No. 179,* 23 Md.App. at 501, 327 A.2d 793; *In re Roberts,* 13 Md.App. at 653, 284 A.2d 621; *In re Wooten,* 13 Md.App. at 529–30 & n. 2, 284 A.2d 32; *In re Hamill,* 10 Md.App. at 593, 271 A.2d 762.

Although the psychological tests suggested that further rehabilitative treatment and greater accountability on the part of appellant are in order, none of these findings appears to demonstrate a propensity for future violence or delinquent acts. Notably, the State never presented any evidence supporting its claim that appellant poses a present threat to the safety of others. Thus, at the hearing appellant's counsel correctly characterized the evidence before the court when she stated that "there has been not a scintilla of evidence presented in this courtroom that this child has presented any threat to anybody in the past 17 months."

As to appellant's current behavior, the ASA placed in evidence only Dr. Estupinan–Kane's report, which concluded that "Julianna does not appear to be at significant risk for continued aggressive behavior," and recommended that "a gradual transition from placement to the community would be appropriate." The only other evidence presented by the State was the testimony of the victim's family as to the impact of the murder upon them. While we do not minimize the importance of this testimony, it cannot substitute for evidence concerning appellant's rehabilitative progress. As the fact finder, the court was certainly entitled to reject the unrefuted evidence presented on appellant's behalf. But, the State's failure to present any countervailing evidence surely was a factor to be considered.

In any event, the court's remarks indicate that it did *not* discredit the testimony presented. To the contrary, the court described Dr. Estupinan–Kane as "one of the most outstanding psychologists that I've ever had contact with," and in its bench opinion the court explicitly noted Dr. Estupinan–Kane's assessment that appellant did not "appear to be at significant risk for continued aggressive behavior." The court also credited the testimony of Secretary DeVore and the other DJS

professionals who testified in favor of modification. It said, "All reports have been positive, and I have not heard of any infractions...." Acknowledging that DJS's recommendations were "well thought-out," the court remarked: "I don't doubt ... that [Julianna] exhibited the type of conduct ... which in their opinion, would require [her] to take the next step, which would be transition into the community."

With regard to Dr. Estupinan–Kane's report, the court seems to have focused on the few comments that could be characterized as negative, despite the psychologist's favorable conclusions as to the unlikelihood of further delinquent acts, and the psychologist's recommendations for disposition. Yet, even Dr. Estupinan–Kane's few "negative" findings did not suggest any danger to public safety.

We glean from the record that the court was frustrated that appellant continued to insist that she acted in self defense. The court said:

> On the negative side, [Dr. Estupinan–Kane] states that the testing suggests that you're rather egocentric, and your primary coping mechanism appears to be avoidance. The MACI tests suggest you may appear entitled, and you may engage in manipulative and attention-seeking behavior, to see that your needs for attention are met. Testing also indicates that you're indifferent to the needs and concerns of others, and you still maintain that you acted in self-defense.

We are persuaded that the court failed to balance the Act's rehabilitative goals with its concerns for public safety and accountability. While purporting to credit the uncontroverted testimony of appellant's behavior and low propensity for future violence, the court declared appellant a "danger to others" on the basis of the gravity of her prior offense. Moreover, the court disregarded the testimony that, without "transitional visits," DJS lacked the ability to provide further rehabilitative treatment to appellant, and would be significantly hampered in its ability to further her education.

The court below was understandably concerned that appellant had not fully acknowledged the gravity of her offense, and was clearly dismayed because appellant continued to insist that she acted in self-defense. It lamented that she needed "to develop compassion, selflessness, respect for others, appreciation of life, and an understanding of how lucky you are, and a deep understanding of what your conduct caused." Public safety, as well as appellant's character development and accountability for her actions, were certainly proper factors in the court's analysis. But, it does not appear that the court adequately considered the unrefuted evidence that some privileges were appropriate, if not altogether necessary, in regard to appellant's rehabilitation.

 When reviewing a trial court's ruling for abuse of discretion, we are acutely aware that "[o]ur concern is not . . . with whether [the judge] was right or wrong. . . . [E]ven a poor call is not necessarily an abuse of discretion. . . . [T]he ruling in issue does not have to have been right to survive so minimal and deferential a standard of review." *Stuples v. Baltimore City Police Dept.*, 119 Md.App. 221, 232, 704 A.2d 518 (1998). Moreover, "a discretionary ruling will generally not be deemed an abuse of discretion unless it is 'well removed from any center mark imagined by the reviewing court' or is 'beyond the fringe of what' the reviewing court 'deems minimally acceptable.'" *Jones v. State*, 403 Md. 267, 291, 941 A.2d 1082 (2008) (internal citations omitted). Nor may we substitute our judgment for that of the fact finder, "'even if we might have reached a different result'. . . ." *Gordon v. Gordon*, 174 Md.App. 583, 626, 923 A.2d 149 (2007) (citation omitted). Nevertheless, "trial judges do not have discretion to apply inappropriate legal standards, even when making decisions that are regarded as discretionary in nature." *Wilson–X v. Dept. of Human Resources ex rel. Patrick*, 403 Md. 667, 675, 944 A.2d 509 (2008). *See also Aventis Pasteur, Inc. v. Skevofilax*, 396 Md. 405, 433, 914 A.2d 113 (2007); *Ehrlich v. Perez*, 394 Md. 691, 708, 908 A.2d 1220 (2006).

In sum, we do not minimize the gravity of appellant's actions. Her murder of Kanisha Neal was a grievous act, and the seriousness of appellant's offense should weigh strongly in the court's disposition. It appears, however, that the juvenile court improperly "based [its] disposition primarily on the nature of the delinquent act itself," *In re Roberts,* 13 Md.App. at 651, 284 A.2d 621, and in so doing, failed to appropriately consider all the standards for juvenile disposition set out by the Legislature.

Of course, it is not our province to determine whether appellant is ready for the privileges that DJS and appellant requested. Obviously, a commitment to a secure DJS facility, on terms denying DJS the discretion to grant even small amounts of supervised leave, is the most restrictive commitment option in the juvenile court's arsenal. The court abused its discretion by continuing that commitment without adequately considering the legislative priorities of the Act, as well as the consensus of the experts with respect to Julianna's undenied progress and the appropriate course for her rehabilitation. Therefore, we must vacate the judgment and remand for a new review hearing, at which the court should consider, *inter alia,* appellant's conduct since the hearing *sub judice.* In doing so, we express no opinion as to the appropriate disposition.

**MOTION TO DISMISS APPEAL DENIED. JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY, SITTING AS A JUVENILE COURT, VACATED. CASE REMANDED FOR FURTHER PROCEEDINGS, CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY MONTGOMERY COUNTY.**